**FIRST GIBRALTAR BANK, FSB, and Beneficial Texas, Inc., Plaintiffs,**

v.

**Dan MORALES, as Attorney General for the State of Texas, and Albert Endsley, as Texas Consumer Credit Commissioner, Defendants.**

No. A–92–CA–274 SS.

United States District Court,
W.D. Texas,
Austin Division.

Feb. 10, 1993.

John L. Hill, Jr., Liddell, Sapp, Zivley, Hill & LaBoon, Houston, TX, for plaintiffs.

Fred I. Lewis, Texas Atty. Gen.'s Office, Finance Div., Peter A. Winn, Marc H. Burns, Office of the Atty. Gen., Austin, TX, for defendants.

## ORDER

SPARKS, District Judge.

BE IT REMEMBERED on the 26 day of August, 1992, came on to be heard and considered the parties' cross-motions for summary judgment. The parties were represented by counsel. Having considered the motions, all relevant pleadings and the argument of counsel, the Court believes Defendants' motion for summary judgment should be granted and Plaintiffs' motion for summary judgment should be denied.

### I.

Plaintiff First Gibraltar Bank, FSB (First Gibraltar) is a federally chartered savings bank [1] that is regulated by the Home Owners' Loan Act, as amended, 12 U.S.C. §§ 1461–1470. Plaintiff Beneficial Texas Inc. (Beneficial) is a nonfederally-chartered financial services corporation that is duly licensed in Texas.[2] They wish to make, purchase and enforce alternative mortgage transactions [3] secured by a lien on the borrower's homestead.[4] Article XVI,

---

1. *See,* 12 U.S.C. § 1462(5).

2. *See,* TEX.REV.CIV.STAT. art. 5069–3.01 et seq.

3. An alternative mortgage transaction is "a loan or credit sale secured by an interest in residential real property, a dwelling, all stock allocated to a dwelling unit in a residential cooperative housing corporation, or a residential manufactured home (as that term is defined in section 5402(6) of Title 42)—
    (A) in which the interest rate or finance charge may be adjusted or renegotiated;
    (B) involving a fixed-rate, but which implicitly permits rate adjustments by having the debt mature at the end of an interval shorter than the term of the amortization schedule; or
    (C) involving any similar type of rate, method of determining return, term, repayment, or other variation *not common to traditional* fixed-rate, fixed-term transactions, including

without limitation, transactions that involve the sharing of equity or appreciation."
12 U.S.C. § 3802(1). Alternative mortgage transactions include reverse mortgages and line of credit conversion mortgages. A reverse mortgage is basically the opposite of a mortgage. Instead of paying a mortgage company regularly scheduled payments in a specified amount, the mortgage company pays the borrower regularly scheduled payments in specified amounts. A line of credit conversion mortgage *is a variant of* a reverse mortgage. Instead of receiving regularly scheduled payments, the borrower has the option of receiving payments on demand in a desired amount.

4. TEX.PROP.CODE § 41.002 provides:
    (a) If used for the purposes of an urban home or as a place to exercise a calling or business in the same urban area, the homestead of a family or a single, adult person, not otherwise

§ 50[5] of the Texas Constitution and Tex. Prop.Code § 41.001[6], however, voids liens created by such transactions on homestead property. Texas law prohibits a creditor from foreclosing on homestead property unless the debt is for purchase money for the homestead, taxes on the homestead, or work and materials used in constructing improvements to the homestead. Furthermore, the Texas Consumer Credit Commissioner has opined that such loans may violate the Texas Deceptive Trade Practices Act (DTPA), TEX.BUS. & COMM.CODE § 17.41 et seq. *See,* Texas Consumer Credit Commissioner, Interpretative Letter No. 86–6 (December 16, 1986). Plaintiffs fear that if they make, purchase or enforce alternative mortgage transactions, Defendants will enjoin their actions, prosecute them under Texas law and revoke their corporate charter or license.

Their fears arise because of the authority and the duties the Defendants in this case possess. Defendant Dan Morales is the Texas Attorney General. As the Attorney General, he has the authority and the duty to enforce the Texas Constitution and the laws of the State of Texas. This includes the authority and duty to suspend or revoke corporate charters, sue for injunctive relief, and bring an action on behalf of the State for civil penalties and/or injunctive relief under the DTPA. *See,* TEX. CONST. art. 4, § 22; TEX.GOV'T CODE § 402.021 et seq.; and TEX.BUS. & COMM.CODE § 17.41 et seq. Defendant Albert Endsley is the Texas Consumer Credit Commissioner. As such, he enforces the majority of the chapters of the Texas Consumer Credit Code (Credit Code) which means he regulates the vast majority of consumer loans and consumer credit transactions authorized under Texas law. *See,* TEX.REV.CIV.STAT. art. 5069–2.02A(1). He also has the authority to issue interpretations of the Credit Code. *See,* TEX.REV.CIV.STAT. art. 5069–2.02A(10). The Credit Code prohibits lenders, such as Beneficial, from making, purchasing and enforcing alternative mortgage transactions other than for purchase money, work and materials to construct improvements and/or real estate taxes, TEX.REV.CIV.STAT. art. 5069.3.20(2), and the Credit Commissioner may suspend or revoke a lender's license if the lender violates this provision. TEX. REV.CIV.STAT. art. 5069–3.07(1)(b).

Plaintiffs filed this suit for declaratory and injunctive relief. They contend that the Home Owners' Loan Act (HOLA), as amend-

entitled to a homestead, shall consist of no more than one acre of land which may be in one or more lots, together with any improvements thereon.
(b) If used for the purposes of a rural home, the homestead shall consist of:
(1) for a family, not more than 200 acres, which may be in one or more parcels, with the improvements thereon; or
(2) for a single, adult person, not otherwise entitled to a homestead, not more than 100 acres, which may be in one or more parcels, with the improvements thereon.

**5.** TEX. CONST. art. XVI, § 50 states, in pertinent part:

The homestead of a family, or single adult person, shall be, and is hereby protected from forced sale, for the payment of all debts except for the purchase money thereof, or a part of such purchase money, the taxes due thereon, or for work and material used in constructing improvements thereon, and in this last case only when the work an material are contracted for in writing, with the consent of both spouses, in the case of a family homestead, given in the same manner as is required in making a sale and conveyance of the homestead; nor may the owner or claimant of the property claimed as homestead, if married, sell or abandon the homestead without the consent of the other spouse, given in such manner as may be prescribed by law. No mortgage, trust deed, or other lien on the homestead shall ever be valid, except for the purchase money therefor, or improvements made thereon, as hereinbefore provided, whether such mortgage, or trust deed, or other lien, shall have been created by the owner alone, or together with his or her spouse, in case the owner is married.

**6.** TEX.PROP.CODE § 41.001 provides, in pertinent part:

(a) A homestead ... [is] exempt from seizure for the claims of creditors except for encumbrances properly fixed on homestead property.
(b) Encumbrances may properly fixed on homestead property for:
(1) purchase money;
(2) taxes on the property; or
(3) work and material used in constructing improvements on the property if contracted for in writing before the material is furnished or the labor is preformed and in a manner required for the conveyance of a homestead, with joinder of both spouses if the homestead claimant is married.

ed, 12 U.S.C. §§ 1461–1470, the Alternative Mortgage Transaction Parity Act of 1982 (Parity Act), 12 U.S.C. §§ 3801–3806, and the regulations promulgated under them preempt Texas homestead law to the extent that Texas homestead law prohibits alternative mortgage transactions. Plaintiffs seek declaratory judgment that the HOLA and the Parity Act have preempted Texas homestead law to the extent that Texas homestead law prohibits alternative mortgage transactions.[7] In addition, they seek an injunction enjoining Defendants from enforcing the alleged preempted portions of Texas homestead law and/or prosecuting Plaintiffs if they violate the alleged preempted portions.

Defendants disagree and assert that neither the HOLA regulations nor the Parity Act have preempted any portion of Texas homestead law. The Texas Attorney General stated this position in a 1990 Texas Attorney General Opinion. *See,* Op.Tex.Att'y Gen. No. JM–1269 (1990).

## II.

Congress, acting within the authority granted it by the Supremacy Clause, U.S. Const., Art. VI, cl. 2[8], may enact legislation that preempts state law. Preemption may be either expressly stated in the statute or "implicitly contained in its structure and purpose." *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977); *See also, Cipollone v. Liggett Group, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992). Either way, the ultimate question remains the same—Did Congress intend to preempt state law? *See, Louisiana Public Service Commission v. Federal Communications Commission,* 476 U.S. 355, 369, 106 S.Ct. 1890, 1899, 90

L.Ed.2d 369 (1986) ("The critical question in any preemption analysis is always whether Congress intended that federal regulation supersede state law."); *Fidelity Federal Savings and Loan Association v. de la Cuesta,* 458 U.S. 141, 152–153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982). A court always "start[s] with the assumption that the historic police powers of the States [are] not to be superseded by … Federal Act unless that [is] the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corporation,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947).

The Supreme Court has made it clear that state law is preempted if Congress has completely displaced state law in a specific area or it "actually conflicts" with federal law. *California Federal Savings and Loan Association v. Guerra,* 479 U.S. 272, 281, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987); *de la Cuesta,* 458 U.S. at 153, 102 S.Ct. at 3022. State law "actually conflicts" with federal law if "there is outright conflict between federal and state law," *Louisiana Public Service Commission v. Federal Communications Commission,* 476 U.S. at 368, 106 S.Ct. at 1898, "compliance with both federal and state regulations is a physical impossibility," *Florida Lime and Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–143, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), or state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

The authority to preempt does not depend upon the classification of the state law allegedly preempted. As the Supreme Court has stated: "The relative importance to the State of its own law is not material

---

7. Plaintiffs are only seeking a limited preemption of Texas homestead law. They only contend that Texas homestead law has been preempted to the extent that it prohibits alternative mortgage transactions. They do not contend that HOLA or the Parity Act preempts "Texas Homestead Law in other contexts such as traditional fixed-rate, fixed-term home loan transactions, federal bankruptcies in which debtors elect to use state law exemptions, and judgment creditor claims against individual debtors." *See, Complaint for Declaratory Judgment and Injunctive Relief,* p. 16 (May 4, 1992).

8. Article VI, Clause 2 of the U.S. Constitution provides:

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

when there is a conflict with a valid federal law, for the Framers of our Constitution provided that the federal law must prevail." *Free v. Bland,* 369 U.S. 663, 666, 82 S.Ct. 1089, 1092, 8 L.Ed.2d 180 (1962). Thus, preemption principles apply despite the fact that Plaintiffs are seeking a ruling that Federal law has preempted Texas real property law. *de la Cuesta,* 458 U.S. at 153, 102 S.Ct. at 3022 ("These principles are not inapplicable here simply because real property law is a matter of special concern to the States.").

■■■ Furthermore, Congress may delegate its preemptive authority to an administrative agency. *de la Cuesta,* 458 U.S. at 153, 102 S.Ct. at 3022. Where Congress has done so and the agency acts within the scope of that authority, the agency may preempt and "render unenforceable state or local laws that are otherwise not inconsistent with federal law." *Louisiana Public Service Commission,* 476 U.S. at 369, 106 S.Ct. at 1898–1899; *See also, de la Cuesta,* 458 U.S. at 153–154, 102 S.Ct. at 3022–3023. Moreover, the authority of an agency to preempt state law "does not depend on an express congressional authorization to displace state law." *de la Cuesta,* 458 U.S. at 154, 102 S.Ct. at 3023. "Where Congress has directed an administrator to exercise his discretion, his judgments are subject to judicial review only to determine whether he has exceeded his statutory authority or acted arbitrarily." *de la Cuesta,* 458 U.S. at 153–154, 102 S.Ct. at 3022–3023. As the Supreme Court recently noted:

> It has long been recognized that many of the responsibilities conferred on federal agencies involve a broad grant of authority to reconcile conflicting policies. Where this is true, the Court has cautioned that even in the area of pre-emption, if the agency's choice to preempt "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or legislative history that the accommodation is not one that Congress would have sanctioned."

*City of New York v. Federal Communications Commission,* 486 U.S. 57, 64, 108 S.Ct. 1637, 1642, 100 L.Ed.2d 48 (1988). To determine whether an agency's action preempts state law, a court must determine whether (1) the agency intended to preempt state law, and, if so, (2) whether the agency exceeded its statutory authority or acted arbitrarily in preempting state law. *See, de la Cuesta,* 458 U.S. at 153–154, 102 S.Ct. at 3022–3023. Finally, "substantial deference to an agency's determination of its authority may be appropriate." *NCNB Texas National Bank v. Cowden,* 895 F.2d 1488, 1494 (5th Cir.1990).

### III.

The HOLA was originally passed in 1933 as the "Home Owners' Loan Act of 1933". The "of 1933" was struck by amendments to the act in 1989. The act was a product of the Great Depression and was intended "to provide emergency relief with respect to home mortgage indebtedness" at a time when many homeowners were in default on their mortgages. *See, de la Cuesta,* 458 U.S. at 159, 102 S.Ct. at 3025, *quoting,* H.R.Conf. Rep. No. 210, 73d Cong., 1st Sess., 1 (1933). At the time, almost one-fifth of the country's population did not have access to a home-financing institution. *See, de la Cuesta,* 458 U.S. at 159–160, 102 S.Ct. at 3025–3026, *citing,* H.R.Conf.Rep. No. 210, 73d Cong., 1st Sess., 7, 19 (1933). To ease the situation, Congress enacted the "HOLA of 1933." It provided for a uniform system of federal savings and loans regulated by a single board, the Federal Home Loan Bank Board (FHLBB or Board), so as to ensure the vitality of the federal savings and loans as "permanent associations to promote the thrift of the people in a cooperative manner, to finance their homes and the homes of their neighbors." *de la Cuesta,* 458 U.S. at 160, 102 S.Ct. at 3026, *quoting,* S.Rep. No. 91, 73d Cong., 1st Sess., 2 (1933).

In § 5(a) of the Act, Congress gave the Board plenary authority to issue regulations governing federal savings and loans:

> In order to provide thrift institutions for the deposit or investment of funds and for the extension of credit for homes and other goods and services, the Board is authorized, under such rules and regulations as it may prescribe, to provide for the organi-

zation, incorporation, examination, operation, and regulation of associations to be known as Federal savings and loan associations, or Federal savings banks, and to issue charters therefor, giving primary consideration to the best practices of thrift institutions in the United States. The lending and investment authorities are conferred by this section to provide such institutions the flexibility necessary to maintain their role of providing credit for housing.

12 U.S.C. § 1464(a). "The broad language of § 5(a) expresses no limits on the Board's authority to regulate the lending practices of federal savings and loans." *de la Cuesta*, 458 U.S. at 161, 102 S.Ct. at 3026. This "suggests that Congress expressly contemplated, and approved, the Board's promulgation of regulations superseding state law." *de la Cuesta*, 458 U.S. at 162, 102 S.Ct. at 3027.

▪ The Financial Institutions Reform, Recovery, and Enforcement Act of 1989, 103 Stat. 183 (FIRREA) amended HOLA. The 1989 amendments dissolved the Board and created the Office of Thrift Supervision (OTS) in its place. 12 U.S.C. § 1462a(a and b). It also created the position of Director to head the OTS and granted the Director all powers which were:

(1) vested in the Federal Home Bank Board (in the Board's capacity as such) or the Chairman of such Board on the day before the date of the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989; and

(2) were not

(A) transferred to the Federal Deposit Insurance Corporation, the Federal Housing Finance Board, the Resolution Trust Corporation, or the Federal Home Loan Mortgage Corporation pursuant to any amendment made by such Act; or

(b) established under any provision of law repealed by such Act.

12 U.S.C. § 1462a(e). The authority to preempt state law was not transferred to any of the mentioned organizations or repealed by the FIRREA. FIRREA also granted the Director the authority to "prescribe such regulations and issue such orders as the Director may determine necessary for carrying out this chapter and all other laws within the Director's jurisdiction." 12 U.S.C. § 1462a(b)(2). Congress retained substantially the same language in § 5(a), giving the Director the same plenary power to issue regulations governing federal savings and loans that it had entrusted in the Board:

> In order to provide thrift institutions for the deposit or investment of funds and for the extension of credit for homes and other goods and services, the Director is authorized, under such regulations as it may prescribe, to provide for the organization, incorporation, examination, operation, and regulation of associations to be known as Federal savings and loan associations (including Federal savings banks), and to issue charters therefor, giving primary consideration of the best practices of thrift institutions in the United States. The lending and investment powers conferred by this section are intended to encourage such institutions to provide credit to housing safely and soundly.

12 U.S.C. § 1464(a). Therefore, if anything, the 1989 amendments expanded the power of the Director. Accordingly, the Court concludes that the Director has the authority to promulgate regulations that preempt state law.

### Regulations

▪ Plaintiffs contend that the regulations promulgated by the Director of the OTS and his predecessor the Board pursuant to their authority under the HOLA preempt Texas homestead law to the extent that it prohibits federal savings associations, such as First Gibraltar, from making, purchasing and enforcing alternative mortgage transactions. However, a review of the statute and regulations reveals this is inaccurate.

The HOLA permits, "to the extent specified in regulations of the Director, a Federal savings association to invest in, sell or otherwise deal in ... loans on the security of liens upon residential real property." 12 U.S.C. § 1464(c)(1)(B).

The regulations authorize a Federal savings associations to "exercise all authority granted it by the Home Owners' Loan Act of

1933 ("Act"), 12 U.S.C. § 1464, as amended, and its charter and bylaws, whether or not implemented specifically by [OTS] regulations, subject to the limitations and interpretations contained in this part." 12 C.F.R. § 545.1 (1992).

Section 545.32(a) provides that a Federal savings association may originate, invest in, sell, purchase, service, participate or otherwise deal in loans made on the security of residential real estate or interests in such loans, subject to the limitations of the section.[9] "Residential real estate" includes homestead property in Texas. *See,* 12 C.F.R. § 541.23[10]. The OTS promulgated section 545.32, as well as the other regulations in Part 545, pursuant to its plenary and exclusive authority to regulate all aspects of Federal savings associations, and the regulations preempt any state law purporting to address the operations of Federal savings association. *See,* 12 C.F.R. § 545.2 (1992). Plaintiffs argue, therefore, the regulations preempt Texas homestead law to the extent that it prohibits federal savings associations from making, purchasing and enforcing alternative mortgage transactions, because Texas homestead law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of the regulations.

Plaintiffs' argument, however, ignores § 545.32(c)(2) which expressly provides that state law determines whether a loan on residential property is secured.[11] Texas law provides that homestead property—residential real estate—cannot secure a loan except for loans for purchase money for the homestead, for work and materials used to construct improvements on the homestead and/or for taxes on the homestead. Since the regulations specifically incorporate Texas law to determine whether a loan is secured in Texas, it is undeniable that the regulations promulgated pursuant to the Director's authority under the HOLA were not intended to and do not preempt Texas homestead law.

General Counsel's Advisory Letter

■ Additionally, Plaintiffs insist an advisory letter submitted by the General Counsel of the Board establishes the Director's intent to preempt Texas homestead law to the extent that it prohibits federal savings and loan associations from making, purchasing or enforcing alternative mortgage transactions. *See,* FHLBB General Counsel Opinion Letter (August 4, 1989). In 1989, the General Counsel of the Board issued an advisory letter in which he expressly states:

> The Texas laws [prohibiting lenders from foreclosing on homesteads that secure line of credit conversion mortgages (a type of alternative mortgage transaction)] clearly prevent Federal associations from exercising the authority granted to them by the HOLA and the Board's regulations. Therefore, this Office concludes that the constitution and statutes of Texas under review are "an obstacle to the accomplishment and execution of the purposes and objectives" of 12 C.F.R. pt. 545 to the extent that they prevent Federal associations from securing line of credit conversion mortgages with real estate consisting of homesteads, and foreclosing on such mortgages in the event of default. According to *de la Cuesta,* the HOLA authorizes

**9.** 12 C.F.R. § 545.32(a) provides:
Pursuant to sections 5(c)(1)(B) and 5(c)(2)(B) [12 U.S.C. §§ 1464(c)(1)(B) and (c)(2)(B)], a Federal savings association may originate, invest in sell, purchase, service, participate, or otherwise deal in (including brokerage or warehousing) loans made on the security of residential or nonresidential real estate, or interests in such loans, subject to the limitations of this part.

**10.** 12 C.F.R. § 541.23 defines "residential real estate" as:
homes (including condominiums and cooperatives), combinations of homes and business property, other real estate used for primarily residential 'purposes other than a home (but

which may include homes), combinations of such real estate and business property involving only minor business use, farm residences and combinations of farm residences and commercial farm real estate, property to be improved by the construction of such structures, or leasehold interests in the above real estate.

**11.** Section 545.32(c) states:
(c) *Security property.* A loan is made on the security of real estate if:
(2) The security interest of the Federal savings association may be enforced as a real estate mortgage or its equivalent pursuant to the law of the state in which the property is located.

the Board to enact regulations that preempt substantive state real property laws purporting to govern the mortgage lending operations of Federal associations. The regulatory history of 12 C.F.R. § 545 reveals that the Board exercised this authority to preempt state real property laws, insofar as reverse mortgages are concerned.

FHLBB General Counsel Opinion Letter, pp. 8–9 (August 4, 1989) (footnote omitted). Plaintiffs, relying on *Chevron, U.S.A., Inc. v. Natural Resources Defense*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) and *Gavey Properties/762 v. First Financial Savings and Loan*, 845 F.2d 519 (5th Cir.1988), assert that the advisory letter is equivalent to a regulation promulgated by the Director and is entitled to deference unless it is unreasonable. While the general counsel's advisory letter is entitled to great deference, *See, Espinoza v. Farah Mfg. Co., Inc.*, 414 U.S. 86, 94, 94 S.Ct. 334, 339, 38 L.Ed.2d 287 (1973) (a general counsel's advisory letter interpreting a statute is the agency's interpretation); *Chevron*, 467 U.S. at 844, 104 S.Ct. at 2782 (an administrator of an agency's interpretation of a statute is entitled to deference unless unreasonable); *Griggs v. Duke Power Company*, 401 U.S. 424, 433–434, 91 S.Ct. 849, 854–855, 28 L.Ed.2d 158 (1971) ("The administrative interpretation of [a statute] by the enforcing agency is entitled to great deference."); and *Gavey*, 845 F.2d at 521 (an agency and general counsel's interpretation of a statute is entitled to deference unless unreasonable), the Court believes the interpretation is unreasonable given the unambiguous language of 12 C.F.R. § 545.-32(c)(2) (1992).

## IV.

■ Congress enacted the Parity Act as Title VIII of the Garn–St. Germain Depository Institution Act of 1982, Pub.L. No. 97–320, 96 Stat. 1545 (1982), as amended, 12 U.S.C. § 3801 et seq. The Parity Act was intended to end discrimination between federally and nonfederally chartered housing creditors by authorizing all housing creditors[12] to "make,

purchase and enforce alternative mortgage transactions so long as the transactions are in conformity with the regulations issued by the Federal agencies." 12 U.S.C. § 3801(b). The Parity Act provides that housing creditors may make, purchase and enforce alternative mortgage transactions notwithstanding any state constitution, law or regulation, but they are subject to limitations set out in § 3803. 12 U.S.C. § 3803(c). The limitations divide housing creditors into three categories: banks, credit unions, and all other housing creditors. Plaintiffs are neither a bank nor a credit union. Consequently, by default, they fall into the "all other housing creditors" category.

Section 3803(a)(3) dictates that "all other housing creditors" must make, purchase and enforce alternative mortgage transactions "in accordance with regulations governing alternative mortgage transactions as issued by the Director of the Office of Thrift Supervision for federally chartered savings and loan associations, to the extent that such regulations are authorized by rulemaking authority granted to the Director of the Office of Thrift Supervision with regard to federally chartered savings and loan associations under laws other than this section." Thus, there are two questions: (1) where, outside of 12 U.S.C. § 3803, has Congress granted the Director of the OTS rulemaking authority over alternative mortgage transactions?; and (2) what regulations has the Director of the OTS issued pursuant to that authority?

The answer to the first question is simple; Congress granted the Director of the OTS rulemaking authority over alternative mortgage transactions in the HOLA. *See,* 12 U.S.C. § 1464; *de la Cuesta*, 458 U.S. at 162, 102 S.Ct. at 3027.

Answering the second question is a little more difficult. A federally chartered savings and loan association is a federal savings association. *See,* 12 U.S.C. § 1462(5) ("The term 'Federal savings association' means a Federal savings association or a Federal savings bank chartered under" 12 U.S.C. § 1464.);

---

12. For the purposes of this case, a "housing creditor" is "any person who regularly makes loans, credit sales or advances secured by inter-

ests in [homes] or any transferee of any of them." 12 U.S.C. § 3802(2)(C and D).

H.R.Rep. No. 54(I), 101st Congress, 1st Sess., § 301 (1989), *reprinted in,* 1989 U.S.C.C.A.N. 86, 136 ("The term "Federal association" includes all Federal savings and loan associations and Federal savings banks chartered pursuant to section 5 of the HOLA."). Federally chartered savings and loan associations are, therefore, subject to 12 C.F.R. § 545.33(c)(2) which expressly provides that state law determines whether a home loan is secured. As already stated many times, a lender cannot secure a loan with homestead property in Texas unless the loan is for purchase money for the homestead, work and materials used to construct improvements to the homestead, or taxes on the homestead. Since the regulations promulgated by the Director of the OTS dictate that state law, in this case Texas homestead law, determines whether a loan is secure, it is clear that neither Congress nor the Director intended the Parity Act to preempt Texas homestead law. This is consistent with the Parity Act's stated purpose "to eliminate discrimination the regulations have upon non-federally chartered housing creditors and provide them with parity with federally chartered institutions." 12 U.S.C. § 3801(b).

### V.

The Court is unwilling to hold that the Director of the Office of Thrift Supervision has promulgated regulations preempting Texas homestead law and altered the entire scheme of Texas substantive law relating to its citizens' property rights unless and until the Director's authority to preempt Texas homestead law and his exercise of that authority are convincingly and unquestionably clear. The regulations in this case simply do not satisfy this requirement.

The Court concludes that neither the Director of the Office of Thrift Supervision in promulgating regulations pursuant to his authority under the HOLA nor Congress in enacting the Parity Act intended to preempt Texas homestead law prohibiting federal savings associations from making, purchasing and enforcing alternative mortgage transactions. Consequently, Plaintiffs First Gibraltar and Beneficial remain subject to Texas homestead laws when making, purchasing and enforcing alternative transactions.

IT IS ORDERED that Plaintiffs First Gibraltar Bank and Beneficial Texas' Motion for Summary Judgment is DENIED.

IT IS ORDERED that Defendants Dan Morales and Albert Endsley's Motion for Summary Judgment is GRANTED.