United States Court of Appeals,

Fifth Circuit.

No. 93-8170.

FIRST GIBRALTAR BANK, FSB, and Beneficial Texas, Inc., Plaintiffs-Appellants,

v.

Dan MORALES, Atty. General, as Attorney General for the State of Texas, Defendant-Appellee.

April 29, 1994.

Appeal from the United States District Court for the Western District of Texas.

Before POLITZ, Chief Judge, KING and DAVIS, Circuit Judges.

KING, Circuit Judge:

The district court entered summary judgment in favor of the defendant in this action for declaratory judgment and injunctive relief brought by First Gibraltar Bank, FSB, and Beneficial Texas, Inc. The issue present ed for our determination is whether federal statutes and regulations have preempted Texas homestead law to the extent that it prohibits lenders from enforcing liens on home equity created in reverse annuity mortgages or line of credit conversion mortgages.

## I. BACKGROUND

First Gibraltar Bank, FSB (First Gibraltar), is a federally chartered savings bank; Beneficial Texas, Inc. (Beneficial), is a non-federally chartered financial services corporation that is licensed to do business in Texas. To gether, First Gibraltar and Beneficial (the banks) filed a complaint for declaratory judgment and injunctive relief in federal district court against Dan Morales as attorney general for the state of Texas and Albert Endsley as Texas Consumer Credit Commissioner (referred to herein collectively as "the state of Texas"). The banks requested the district court (1) to declare that federal law preempts Texas homestead law to the extent that Texas law prohibits federal savings associations from enforcing liens taken in alternative mortgage transactions secured by a homeowner's equity such as reverse annuity mortgages and line of credit conversion mortgages, (2) to declare that this federal preemption also extends to state-chartered institutions under the Parity Act, and (3) to order appropriate injunctive relief in conjunction with those declarations.

Both sides moved for summary judgment. After oral argument, the district court denied the plaintiffs' motion and granted summary judgment in favor of the defendants. The court's order is reported as *First Gibraltar Bank, FSB, v. Morales,* 815 F.Supp. 1008 (W.D.Tex.1993). This appeal followed, and numerous amici curiae have filed briefs in this court. Among the amici is the OTS itself, which has filed a brief in support of the banks' position.

## II. STANDARD OF REVIEW

A district court's conclusions of law are reviewable de novo. *Prudhomme v. Tenneco Oil Co.,* 955 F.2d 390, 392 (5th Cir.), *cert. denied,* --- U.S. ----, 113 S.Ct. 84, 121 L.Ed.2d 48 (1992).

We are required to give deference to an executive agency's interpretation of a statute or regulation that the agency is responsible for administering. Of course, if the intent of Congress is clear, that intent will trump any agency interpretation to the contrary. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984); *Hawkins v. Agricultural Marketing Serv., Dep't of Agric.,* 10 F.3d 1125, 1129 (5th Cir.1993). If Congress did not directly address the precise question at issue, however, we must defer to the agency's interpretation of that statute as expressed in its regulations unless those regulations are arbitrary, capricious, or manifestly contrary to the statute. *Chevron,* 467 U.S. at 843-44, 104 S.Ct. at 2781-82. Deference is even more clearly in order when an agency construction of its own regulations is involved; the agency construction is controlling unless it is plainly erroneous or inconsistent with the regulation. *Stinson v. United States,* --- U.S. ----, ----, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598 (1993); *Udall v. Tallman,* 380 U.S. 1, 16-17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

## III. ANALYSIS

Before proceeding with our analysis of the preemption issues presented by this case, we will first briefly survey the legal backdrop against which this case arises. A review of Texas homestead law and the legal features of reverse annuity mortgages and line of credit conversion mortgages thus follows. Additionally, the state of Texas has raised a ripeness issue that we address before reaching the merits of this controversy.

A. BACKGROUND

1. *Texas Homestead Law*

The "homestead exemption" is the well-known provision of Texas law that protects certain real property interests from foreclosure and forced sale for the payment of debts, with very few exceptions. The exemption is guaranteed in the Texas Constitution, which provides in pertinent part:

> The homestead of a family, or of a single adult person, shall be, and is hereby protected from forced sale, for the payment of all debts except for the purchase money thereof, or a part of such purchase money, the taxes due thereon, or for work and material used in constructing improvements thereon.... No mortgage, trust deed, or other lien on the homestead shall ever be valid, except for the purchase money therefor, or improvements made thereon, as hereinbefore provided....

TEX. CONST. art. XVI, § 50; *see also* TEX.PROP.CODE ANN. § 41.001 (West Supp.1994) (mirroring the provisions of TEX. CONST. art. XVI, § 50). The Texas Constitution further establishes that the key defining feature of a homestead is that the property is "used for the purposes of a home, or as a place to exercise the calling or business of the homestead claimant, whether a single adult person, or the head of a family." TEX. CONST. art. XVI, § 51. A person claiming homestead rights in property has the burden of proving both overt acts of homestead usage and intent to claim the land as a homestead. *Kennard v. MBank Waco, N.A. (In re Kennard),* 970 F.2d 1455, 1458 (5th Cir.1992); *see also Gregory v. Sunbelt Sav., F.S.B.,* 835 S.W.2d 155, 158 (Tex.App.—Dallas 1992, writ denied) ("The homestead character of property can be established prior to actual occupancy when the owner intends to improve and occupy the premises as a homestead."). It should be noted that this protection by no means embraces *all* of a home owner's property; the exemption may be claimed on a maximum of 200 acres of land and improvements in rural areas or one acre of land and improvements in a city, town, or village. TEX. CONST. art. XVI, § 51.

Strong legal protection of the homestead from foreclosure has long been viewed as an important public policy in Texas. As Chief Justice Hemphill of the Texas Supreme Court once wrote,

> The object of such exemption is to confer on the beneficiary a home as an asylum, a refuge which cannot be invaded nor its tranquility or serenity disturbed, and in which may be nurtured and cherished those feelings of individual independence which lie at the foundation and are essential to the permanency of our institutions.

*Wood v. Wheeler,* 7 Tex. 13, 22 (1851). As the banks correctly point out, however, this protection

is not cost-free.  The homestead exemption effectively prevents home owners from converting their home equity into liquid assets through secured borrowing.  *See* 2 GEORGE D. BRADEN ET AL., THE CONSTITUTION OF THE STATE OF TEXAS:  AN ANNOTATED AND COMPARATIVE ANALYSIS 790 (no date) (noting that the homestead exemption "effectively prevents mortgaging the homestead to meet a financial emergency;  the only source of funds thus may be outright sale of the homestead").  The banks are of the view that lending institutions also bear part of the cost of Texas' homestead laws because those laws prevent them from engaging in certain mortgage lending activities.

### 2. *Reverse Annuity Mortgages*

In their complaint, the banks sought a declaration that

[federal statutes] preempt those portions of the Texas homestead law that prevent federally-chartered savings and loan associations from creating enforceable liens on Texas homesteads otherwise permitted by federal law and regulations.

The banks also sought a declaration that federal law gives housing creditors in Texas other than federal savings associations the same right "to make, purchase and enforce alternative mortgage transactions" as possessed by federal associations.  The banks expressly denied that they were seeking a declaration that Texas homestead law had been preempted in its entirety, and they admitted that Texas homestead law would continue to apply in such contexts as "fixed-rate, fixed-term home loan transactions, federal bankruptcies [in which state exemptions are claimed], and judgment creditor claims against individual debtors."

We note at the outset that the term used by the parties and the court below, "alternative mortgage transaction" (AMT), is a broad catch-all term for all manner of mortgage instruments that do not conform to the traditional fully-amortized, fixed-interest-rate mortgage loan.  These AMTs include such instruments as the adjustable interest rate mortgage and the graduated payment mortgage.  *See generally* GRANT S. NELSON & DALE A. WHITMAN, REAL ESTATE TRANSFER, FINANCE, AND DEVELOPMENT 1000-13 (4th ed. 1992).  Through their motions for summary judgment and on this appeal, the parties have made clear that their dispute does not concern these now-familiar alternative mortgage instruments but rather focuses on AMTs that are directly foreclosed by the impact of the Texas homestead law, namely the "reverse annuity mortgage" (RAM) and the "line of

credit conversion mortgage," which is a variant of the RAM.

We shall therefore limit our preemption analysis and our decision to the two types of alternative mortgage instruments specifically enumerated by the banks, the RAM and the line of credit conversion mortgage. Black's Law Dictionary defines a RAM as

> [a] mortgage format under which the mortgage loan proceeds are disbursed periodically over a long time period to provide regular income for the borrower-mortgagor. The loan will usually be repaid in a lump sum when the mortgagor dies or the property is sold.

BLACK'S LAW DICTIONARY 1011 (6th ed. 1990). Although the regulations adopted by the OTS do not mention the RAM by name, they do describe that mortgage instrument in terms consistent with the above definition: "The loan contract may provide for the deferral and capitalization of all interest on loans to natural persons secured by borrower-occupied property and on which periodic advances are being made." 12 C.F.R. § 545.33(a) (1993). We conclude that a RAM is a mortgage instrument that provides for periodic payments from the mortgagee to the mortgagor, with the loan being secured by the mortgagor's equity in real property. The line of credit conversion mortgage is a variant of the RAM in which the mortgagor is provided with a line of credit so that he may receive payments on demand rather than regularly-scheduled payments.

The parties agree that a lien taken on a homestead in a RAM or line of credit conversion mortgage is not enforceable under Texas homestead law.

### B. JUSTICIABLE CASE OR CONTROVERSY

Before addressing the merits of this case, we must pass on the state of Texas' argument that this action must be dismissed for lack of subject matter jurisdiction. Under the Declaratory Judgment Act, a federal district court has the discretionary power to enter a declaratory judgment "[i]n a case of actual controversy within its jurisdiction." 28 U.S.C. § 2201. The state of Texas, in its response to the banks' motion for summary judgment, argued that the district court should deny summary judgment because the banks had not shown an actual controversy within the meaning of § 2201.

The Supreme Court has told us that the district courts are without the power to grant declaratory relief unless an actual controversy exists. *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 272, 61 S.Ct. 510, 511, 85 L.Ed. 826 (1941). The question, which is admittedly

one of degree, is "whether the controversy is of sufficient immediacy and reality to permit a declaratory judgment." 10A CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2757 (1983); *see also Middle South Energy, Inc. v. City of New Orleans,* 800 F.2d 488, 490 (5th Cir.1986) ("A federal court may not issue a declaratory judgment unless there exists ... a substantial controversy of sufficient immediacy and reality between parties having adverse legal interests."). The district court in the instant case implicitly resolved this issue in favor of the plaintiffs, noting that "[p]laintiffs fear that if they make, purchase or enforce alternative mortgage transactions, Defendants will enjoin their actions, prosecute them under Texas law and revoke their corporate charter or license." *First Gibraltar Bank,* 815 F.Supp. at 1010. The court below also noted that the Texas Consumer Credit Commissioner issued an opinion in 1986 that such loans may violate the Texas Deceptive Trade Practices Act, TEX.BUS. & COMM.CODE § 17.41-.63 (West 1987 and West Supp.1994), and that the Texas Attorney General issued an opinion in 1990 that the federal laws now relied upon by the banks had not preempted any aspect of Texas homestead law. *First Gibraltar Bank,* 815 F.Supp. at 1010, 1011.

The state of Texas contends that the plaintiffs have failed to show a real and immediate threat of injury and that "[i]t is purely a matter of conjecture whether the State will ... ever file suit against the [plaintiffs] on the theory on which the [plaintiffs] requested a declaration." For support, the state of Texas relies on our opinion in *Texas v. West Publishing Co.,* 882 F.2d 171, 175 (5th Cir.1989), *cert. denied,* 493 U.S. 1058, 110 S.Ct. 869, 107 L.Ed.2d 953 (1990), in which we applied a two-pronged test fashioned by the Federal Circuit to determine whether an "actual controversy" existed in the context of an intellectual property case. Under that test, the declaratory plaintiff must show both a real and reasonable apprehension of litigation and a course of conduct that brings it into adversarial conflict with the declaratory defendant. *Id.* We agree with the plaintiffs, however, that *West Publishing* is not controlling; the test we applied in that case was adopted specifically for its intellectual property context, and we decline to extend it to this alleged clash between state law and federal right.

We find the case of *Pacific Gas & Elec. Co. v. State Energy Resources Conservation and*

*Dev. Comm'n,* 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983), particularly instructive. That case involved, *inter alia,* a California statute that imposed a moratorium on the certification of new nuclear power plants until the state energy commission found that a method of permanent disposal of high-level nuclear wastes had been successfully developed and had received federal approval. *Id.* at 198, 103 S.Ct. at 1719. The plaintiff utilities filed an action seeking a declaratory judgment that this statute had been preempted by the federal Atomic Energy Act. *Id.* The Court agreed with the plaintiffs that the aspect of their suit involving this statute was ripe for judicial review. *Id.* at 200, 103 S.Ct. at 1720. Particularly important to the Court's determination were the facts that "[t]he question of pre-emption is predominately legal" and therefore fit for judicial decision, and that "postponement of decision would likely work substantial hardship on the utilities." *Id.* at 201, 103 S.Ct. at 1720-21. We conclude that the banks in the instant action are in much the same position as the utilities were in *Pacific Gas.* Although the banks could simply proceed on the assumption that their view of federal preemption of Texas homestead law is correct, they would risk incurring significant losses should their legal theory prove incorrect. The potential consequences to the banks are sufficiently concrete to support an action for declaratory judgment. *See Whitney v. Heckler,* 780 F.2d 963, 969 n. 6 (11th Cir.) ("[A]n issue is ripe for judicial review when the challenging party is placed in the dilemma of incurring the disadvantages of complying or risking penalties for noncompliance."), *cert. denied,* 479 U.S. 813, 107 S.Ct. 65, 93 L.Ed.2d 23 (1986).

We conclude that the district court's decision not to dismiss this declaratory judgment action for lack of an "actual controversy" was not erroneous.

## C. PREEMPTION

We now address the merits of the banks' argument that federal preemption of Texas homestead law has occurred insofar as Texas law prohibits the enforcement of liens acquired in RAMs or line of credit conversion mortgages. Before we do so, we again emphasize that the question before us is not whether federal law has preempted Texas homestead law in its entirety, but only whether Texas homestead law has been preempted with respect to RAMs and line of credit conversion mortgages. We first examine the contours of federal preemption doctrine before

surveying the legal materials relied upon by the banks in this action.

## 1. *Federal Preemption Doctrine*

It is unquestioned that Congress has the authority, in the exercise of its Article I powers, to preempt state laws by virtue of the Supremacy Clause of the Constitution. U.S. CONST. art. VI, cl. 2; *California v. ARC Am. Corp.,* 490 U.S. 93, 100, 109 S.Ct. 1661, 1664, 104 L.Ed.2d 86 (1989). Determining when such preemption has in fact occurred, however, is not always a simple task. Preemption is, of course, most easily recognized when Congress displaces state law "by so stating in express terms." *Pacific Gas,* 461 U.S. at 203, 103 S.Ct. at 1722. Federal preemption also occurs when an "actual conflict" develops between federal and state law. *Id.* at 204, 103 S.Ct. at 1722. The Supreme Court has described actual conflict as including situations in which compliance with both federal and state law is a "physical impossibility" and cases in which state law obstructs the "accomplishment and execution of the full purposes and objectives of Congress." *Id.* (citations omitted). A third variety of preemption arises when a scheme of federal legislation is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Id.*

In approaching a preemption question, we must keep in mind that all three types of preemption are premised on a determination of congressional intent to displace the police power of the states. *See Louisiana Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 369, 106 S.Ct. 1890, 1899, 90 L.Ed.2d 369 (1986) ("The critical question in any pre-emption analysis is always whether Congress intended that federal regulation supersede state law."). When Congress legislates in a field of activity traditionally regulated by the states, we must start with a presumption "that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *ARC Am.,* 490 U.S. at 101, 109 S.Ct. at 1665. Real property law has been recognized by the Supreme Court as a matter of special concern to the states. *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982). Although the Court has said that the general principles governing the three types of preemption analysis are applicable even in areas of the law that are "matter[s] of special concern to the States," *id.,* the Court has also indicated that a kind of heightened scrutiny in the form of a "plain statement

rule" is required before we may find federal preemption of state power in "traditionally sensitive areas, such as legislation affecting the federal balance," *Gregory v. Ashcroft,* 501 U.S. 452, ----, 111 S.Ct. 2395, 2401, 115 L.Ed.2d 410 (1991) (citations omitted). It has been noted that federal courts are generally "reluctan[t] to infer preemption in ambiguous cases." LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 6-25 (2d ed. 1988).

State law can be preempted by regulations promulgated by federal agencies acting within the scope of their congressionally delegated authority as well as by federal legislation. *Louisiana Pub. Serv. Comm'n,* 476 U.S. at 369, 106 S.Ct. at 1898; *de la Cuesta,* 458 U.S. at 153, 102 S.Ct. at 3022. "A pre-emptive regulation's force does not depend on express congressional authorization to displace state law; moreover, whether the [agency] failed to exercise an option to promulgate regulations which did not disturb state law is not dispositive." *de la Cuesta,* 458 U.S. at 154, 102 S.Ct. at 3023. Agency decisions to preempt state law are entitled to judicial deference, and if an agency's choice to preempt "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *City of New York v. FCC,* 486 U.S. 57, 64, 108 S.Ct. 1637, 1642, 100 L.Ed.2d 48 (1988) (citing *United States v. Shimer,* 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)). In *de la Cuesta,* the Court made clear that cases of administrative preemption require consideration of two questions: (1) did the agency intend to preempt the state law in question, and (2) if so, was that action within the scope of the agency's delegated authority? *de la Cuesta,* 458 U.S. at 154, 102 S.Ct. at 302.

The state of Texas strongly urges that we should apply the "plain statement rule" of *Gregory* to the instant case. We cannot agree. In *Gregory,* the Supreme Court held that the federal Age Discrimination in Employment Act (ADEA) did not preempt a provision of the Missouri Constitution providing for mandatory retirement of Missouri state judges at age seventy. *Gregory,* --- U.S. at ----, 111 S.Ct. at 2408. Because Congress did not unambiguously intend to include state judges within the ambit of the ADEA, the Court declined to find any intent to preempt on Congress' part. *Id.* at ----, 111 S.Ct. at 2406. Although the Court did not clearly define the circumstances under which this

plain statement rule should be applied, it did state that Missouri's law regarding the qualifications of state judges "goes beyond an area traditionally regulated by the States; it is a decision of the most fundamental sort for a sovereign entity." *Id.* at ----, 111 S.Ct. at 2400; *see also id.* at ----, 111 S.Ct. at 2402 (describing the power to determine the qualifications of state officials as lying "at the heart of representative government"). Although the regulation of real property may be a matter of special concern to the states, *de la Cuesta,* 458 U.S. at 153, 102 S.Ct. at 3022, it does not seem to use to strike "at the heart of representative government" in the same way that the ADEA did in *Gregory. See Reich v. New York,* 3 F.3d 581, 589-90 (2d Cir.1993) (holding that a federal requirement that states pay overtime to their police officers did not "strike at the heart of representative government" (internal quotations omitted)), *cert. denied,* --- U.S. ----, 114 S.Ct. 1187, --- L.Ed.2d ---- (1994); *Gately v. Massachusetts,* 2 F.3d 1221, 1230 (1st Cir.1993) (holding that *Gregory*'s plain statement rule did not apply to state mandatory retirement laws pertaining to police officers).

Our holding that *Gregory* is inapposite to the instant case, however, in no way changes the presumption that historic police powers of the States are not superseded by federal law unless preemption is the clear and manifest purpose of Congress, or, in this case, of the rule-making agency. *ARC Am.,* 490 U.S. at 101, 109 S.Ct. at 1665. With this general principle in mind, we turn to the legal materials on which the banks rely as preempting the homestead law of Texas.

2. *Law Governing Federal Savings Associations*

a. The Law Before 1983

The banks first direct our attention to the Home Owners' Loan Act (HOLA), 12 U.S.C. §§ 1461-1468c. HOLA, which was originally passed during the Great Depression as an emergency relief measure, provided for the creation of a system of federal savings and loan associations regulated by a single federal agency, the Federal Home Loan Bank Board (FHLBB). *de la Cuesta,* 458 U.S. at 159-60, 102 S.Ct. at 3025-26. In 1989, Congress passed the Financial Institutions Reform, Recovery, and Enforcement Act, which amended the HOLA by dissolving the FHLBB and creating the OTS in its place. 12 U.S.C. §§ 1462a-1464; *First Gibraltar Bank,* 815 F.Supp. at 1013. The HOLA authorizes federal savings associations to make loans on the security of liens upon residential

real property to the extent specified in regulations of the Director of the OTS. 12 U.S.C. § 1464(c)(1)(B). The statute also authorizes federal savings associations to make loans on the security of liens upon nonresidential real property, with certain limitations based upon the capital of the particular savings association. 12 U.S.C. § 1464(c)(2)(B).

In 1978, the FHLBB first authorized federal savings associations to use three new types of mortgage instruments: the variable rate mortgage, the graduated payment mortgage, and the reverse annuity mortgage. 43 Fed.Reg. 59,336, 59,336 (1978) ("The variable rate mortgage will ... be authorized on a state-by-state basis; the graduated payment mortgage and reverse-annuity mortgage are hereby authorized *nationwide.*" (emphasis added)). The purpose of the new regulations was "to meet the needs of homeowners during different phases of their financial life cycles." *Id.*

In 1981, the FHLBB promulgated a number of amendments regarding the lending authority of federal savings associations. One primary purpose of the amendments was to authorize those associations "to make, purchase, participate or otherwise deal in adjustable mortgage loan instruments, which permit adjustment of the interest rate." 46 Fed.Reg. 24,148, 24,148 (1981). The adjustable mortgage loan regulation, 12 C.F.R. § 545.6-4a, included an express preemption provision, which stated:

> This exercise of the Board's authority is preemptive of any state law purporting to address the subject of a Federal association's ability or right to make, purchase, participate, or otherwise deal in adjustable mortgage loans, or to directly or indirectly restrict such ability or right.

12 C.F.R. § 545.6-4a(a)(2) (1982). The commentary accompanying the new regulations noted, "This preemption has the effect of precluding the application of the laws of approximately 30 states prohibiting the charging of interest on interest." 46 Fed.Reg. 24,148, 24,151 (1981). We take note of these changes in the regulation of adjustable rate mortgages because, at the same time, the FHLBB took "the opportunity to amend 12 CFR 545.6-4, [authorizing] other alternative mortgage instruments, by inserting a similar preemption of inconsistent state law," *id.,* which provision read as follows:

> This regulation is promulgated pursuant to the plenary and exclusive authority of the Board to regulate all aspects of the operations of Federal associations.... This exercise of the Board's authority is preemptive of any state law purporting to address the subject of a Federal association's ability or right to make, purchase, or participate in the alternative mortgage

instruments set forth in this section [namely graduated payment mortgages and reverse annuity mortgages], or to directly or indirectly restrict such ability.

12 C.F.R. § 545.6-4(a)(2) (1982).

Another significant development in this area of the law prior to 1983 occurred when the Supreme Court decided the *de la Cuesta* case on June 28, 1982. At issue was a FHLBB regulation providing that due-on-sale clauses in mortgage instruments entered into by federal savings associations "shall be exclusively governed by the terms of the loan contract, and all rights and remedies of the association and borrower shall be fixed and governed by that contract." *de la Cuesta,* 458 U.S. at 147, 102 S.Ct. at 3019 (quoting 12 C.F.R. § 545.8-3(f) (1982)). The FHLBB stated in the preamble accompanying the final publication of the regulation that it intended to preempt any state laws imposing additional limitations on the enforceability of due-on-sale clauses. *Id.* (citing 41 Fed.Reg. 18,286, 18,287 (1976)).

The Court recognized that Congress may delegate its power to preempt state laws to federal agencies such as the FHLBB. *Id.* at 153, 154, 102 S.Ct. at 3022, 3022. The Court further stated that a "pre-emptive regulation's force does not depend on express congressional authorization to displace state law; moreover, whether the administrator failed to exercise an option to promulgate regulations which did not disturb state law is not dispositive." *Id.* at 154, 102 S.Ct. at 3023. After stating these general principles, the Court turned aside all of the appellees' arguments against preemption, concluding that any ambiguity in the regulation regarding the FHLBB's preemptive intent was dispelled by the accompanying preamble. *Id.* at 158 & n. 13, 102 S.Ct. at 3025 & n. 13. Having decided that the FHLBB's regulation did indeed conflict with state law, the Court next considered whether the agency had acted within its statutory authority in issuing the preemptive regulation. *Id.* at 159, 102 S.Ct. at 3025. The Court had little difficulty concluding that Congress had given the FHLBB this power in the "ample authority" conferred on the agency in the HOLA "to regulate the lending practices of federal savings and loans so as to further the Act's purposes." *Id.*

b. The Law Since 1983

In 1983, the FHLBB opted to discontinue its practice of promulgating regulations specifically empowering federal savings associations to act and to permit such associations to exercise all powers

granted them by the HOLA, subject only to limitations contained in the regulations. 48 Fed.Reg. 23,032, 23,032 (1983). This revision of the prior regulatory scheme resulted in the deletion of sections providing specific lending authority (such as § 545.6-4), but the FHLBB emphasized that the deletion "d[id] not mean that any authority c[ould] no longer be exercised." *Id.; see* 12 C.F.R. § 545.1 (1984) ("A Federal association may exercise all authority granted it by the [HOLA] and its charter and bylaws, whether or not implemented specifically by Bank Board regulation, subject to the limitations and interpretations contained in this Part."). The provision concerning preemption was relocated to 12 C.F.R. § 545.2 (1984), and it provided that the regulations contained in § 545 are "preemptive of state law purporting to address the subject of the operations of a Federal association." We note that this appro ach has been continued by the OTS; the current versions of 12 C.F.R. §§ 545.1 and 545.2 are essentially identical to their 1984 counterparts.

Regulatory limitations on the power of savings associations to make loans on the security of real est ate are found in 12 C.F.R. § 545.32 (1993). That section authorizes federal savings associations to "originate, invest in, sell, purchase, service, participate, or otherwise deal in ... loans made on the security of residential or nonresidential real estate ... subject to the limitations of this part." 12 C.F.R. § 545.32(a) (1993). Section 545.32 further provides that,

> [s]ubject to the limitations in §§ 545.33 and 545.35 of this part, a real estate loan may be fully amortized, partially amortized, non-amortized, or a line-of-credit loan, and the loan contract may provide for the deferral and capitalization of a portion of the interest.

12 C.F.R. § 545.32(b)(4) (1993). In determining that federal preemption of Texas homestead law had not occurred, the district court relied largely on § 545.32(c)(2), which provides:

> (c) *Security property.* A loan is made on the security of real estate if:

> (2) The security interest of the Federal savings association may be enforced as a real estate mortgage or its equivalent *pursuant to the law of the state in which the property is located*[.]

12 C.F.R. § 545.32(c)(2) (1993) (emphasis added).

The banks also bring to our attention some correspondence between the Department of Housing and Urban Development (HUD) and the FHLBB. In 1988, HUD planned to implement a demonstration program in which it would insure some home equity conversion mortgages, and it

sought an advisory opinion from the FHLBB as to whether its regulations had preempted Texas homestead law so as to make such mortgages enforceable in Texas by federal savings associations and state chartered associations. Deputy General Counsel for the FHLBB responded with an opinion letter dated August 4, 1989. We quote from that letter at length:

> Congress by statute has explicitly permitted Federal associations to secure loans with real estate. 12 U.S.C. § 1464(c)(1)(B). It is axiomatic that the authority to secure loans protects lenders in the event of default on such loans by foreclosing on the property constituting the security. State laws which prevent or otherwise restrict Federal associations from engaging in transactions involving such mortgages, are in conflict with Bank Board regulations.

> The Texas laws in question [i.e., the homestead exemption] clearly prevent Federal associations from exercising the authority granted to them by the HOLA and the Board's regulations. Therefore, this Office concludes that the constitution and statutes of Texas under review are "an obstacle to the accomplishment and execution of the purposes and objectives" of 12 C.F.R. pt. 545 to the extent that they prevent Federal associations from securing line of credit conversion mortgages with real estate consisting of homesteads, and foreclosing on such mortgages in the event of default. According to *de la Cuesta,* the HOLA authorizes the Board to enact regulations that preempt substantive state real property laws purporting to govern the mortgage lending operations of Federal associations. *The regulatory history of 12 C.F.R. § 545 reveals that the Board exercised this authority to preempt state real property laws, insofar as reverse mortgages are concerned....*

> *[W]e opine that Federal associations are authorized to offer, and if the need arises, to foreclose upon line of credit conversion mortgages which are secured by Texas homesteads, despite contrary state law.*

FHLBB General Counsel Opinion Letter, Fed.Banking L.Rep. (CCH) ¶ 82,502, at 61,707-08 (August 4, 1989) (footnotes omitted) (emphases added) [hereinafter FHLBB Letter].

The banks contend, with the full support of the OTS as amicus curiae, that these materials, taken together, demonstrate the intention of the FHLBB/OTS to preempt Texas homestead law insofar as it would prohibit federal savings associations from entering into and enforcing RAMs and line of credit conversion mortgages.

### 3. *Law Governing Non-Federally Chartered Savings Institutions*

The basis for Beneficial's argument that non-federally chartered savings associations also receive the benefit of federal preemption of Texas homestead law is Chapter 39 of Title 12 of the United States Code, formerly designated as the Alternative Mortgage Transaction Parity Act of 1982. 12 U.S.C. §§ 3801-06. The express purpose of the Parity Act is

> to eliminate the discriminatory impact that [federal] regulations [authorizing federal savings associations to enter into AMTs] have upon nonfederally chartered housing creditors and

provide them with parity with federally chartered institutions by authorizing all housing creditors to make, purchase, and enforce alternative mortgage transactions so long as the transactions are in conformity with the regulations issued by ... Federal agencies.

12 U.S.C. § 3801(b). "Housing creditors" is broadly defined to include, *inter alia,* "any person who regularly makes loans, credit sales, or advances secured by interests" in residential properties. 12 U.S.C. § 3802(2)(C). State chartered housing creditors that are neither banks nor credit unions are authorized to engage in AMT lending in accordance with OTS regulations governing such transactions in the federal savings association context. 12 U.S.C. § 3803(a)(3). The Parity Act specifically preempts state law with respect to such authorized transactions, providing that "[a]n alternative mortgage transaction may be made by a housing creditor in accordance with this section, notwithstanding any State constitution, law, or regulation." 12 U.S.C. § 3803(c). The States were given a three-year period during which to "opt out" of the Parity Act's operations, 12 U.S.C. § 3804, but the state of Texas does not argue that it did so. We find it very significant that RAMs were explicitly authorized by the FHLBB under the heading "Alternative Mortgage Instruments" at the time the Parity Act was enacted. 12 C.F.R. § 545.6-4(a), (c) (1982).

The OTS has implemented the Parity Act in 12 C.F.R. § 545.33(f) (1993), which provides in pertinent part as follows:

> Pursuant to [the Parity Act], housing creditors that are not commercial banks, credit unions, or Federal savings associations may make alternative mortgage transactions (as defined by [12 U.S.C. § 3802] and as further defined and described by applicable regulations identified herein) notwithstanding any state constitution, law or regulation. In accordance with section 807(b) of Pub.L. 97-320, the provisions below are identified as appropriate and applicable to the exercise of this authority, and all regulations not identified herein are deemed inappropriate and inapplicable: Section 545.32(b)(3) and (b)(4), § 545.33(a) and (c), and § 563.99.

The banks rely on this section as additional evidence that the OTS intended to preempt Texas homestead law with respect to federal savings associations, as well as evidence of preemptive intent with respect to state-chartered institutions. Interestingly, the interagency letter from the FHLBB to HUD quoted above takes no position on the question of whether federal law has preempted state laws prohibiting state-chartered mortgage lenders from engaging in AMT lending. *See* FHLBB Letter, *supra,* at 61,709 ("The Board believes that state-chartered institutions should consult with the appropriate state regulator about whether such lenders may make certain loans pursuant to [the Parity

Act], notwithstanding contrary state law.").

We may note at this juncture that the FHLBB Letter prompted a member of the Texas legislature to request an opinion from the Texas Attorney General on the correctness of the FHLBB Letter. The Attorney General advised that he was not convinced that the FHLBB was correct in opining that Texas homestead law had been preempted with respect to the power of federal savings associations to engage in home equity lending, but that judicial resolution would have to be awaited for a conclusive answer. Op.Tex.Att'y Gen. No. JM-1269 (1990). The Attorney General did opine that the Parity Act did not authorize state-chartered financial institutions to make and enforce home equity loans despite Texas homestead law. *Id.*

The OTS considered proposing a rule that would amend its regulations and clarify its intention to preempt state law with respect to the ability of federal savings associations "to engage in alternative mortgage transactions, including home equity conversion lending." 58 Fed.Reg. 56,941, 56,941 (1993). Amicus OTS has now informed us, however, that its consideration of the matter is complete and that it has decided to make no further changes in the agency's regulations.

4. *Application of Preemption Doctrine:  Federal Savings Associations*

a. Intent to Preempt

We first inquire whether the materials cited by the banks demonstrate the clear and manifest purpose of the FHLBB/OTS to preempt Texas homestead law with respect to the operations of federal savings associations. Because the current regulations governing federal savings associations are unfortunately vague on the topic of preemption, we find it useful to consider the chronological development of the regulations at issue, those concerning RAMs and line of credit conversion mortgages.

We think it clear that, had this action been brought under the regulatory scheme in place in 1982, Texas' homestead laws would be preempted by the clear intent of the FHLBB in promulgating its regulations regarding RAMs. Texas' homestead laws prohibit private lenders from taking enforceable security interests in real estate coming within the legal definition of "homestead" with two exceptions (for purchase money or home improvements). These restrictions therefore constitute

limits on federal savings associations' "ability or right to make, purchase, or participate" in RAMs, which involve security interests taken in simple accumulated equity. *See* 12 C.F.R. § 545.6-4(c)(1) (1982) (describing RAMs as pro viding "periodic payments to homeowners based on accumulated equity"). A December 1988 report prepared by the House Research Organization to the Texas legislature estimated that Texas' homestead exemption removed from $150 to $260 million in home equity from the lending market, illustrating the substantial limitation on the ability of federal savings associations to make RAMs in Texas. *See* TEXAS HOUSE RESEARCH ORGANIZATION, No. 147, SPECIAL LEGISLATIVE REPORT: SECOND MORTGAGES AND THE TEXAS HOMESTEAD EXEMPTION 30 (Dec. 21, 1988).

Under *de la Cuesta,* we focus our preemption inquiry on the manifestation *vel non* of agency intent to preempt state laws that might limit the ability of federal savings associations to make or participate in, for instance, the reverse annuity mortgages described in 12 C.F.R. § 545.6-4(c) (1982). Any ambiguity regarding agency intent arising from the text of the regulations themselves may be dispelled by reasonable agency constructions of the regulations. *See de la Cuesta,* 458 U.S. at 158 & n. 13, 102 S.Ct. at 3025 & n. 13. The regulations existing prior to 1983 clearly meet this test. State laws that "directly or indirectly" restricted the ability of federal savings associations to engage in graduated payment or reverse annuity mortgages were explicitly preempted by 12 C.F.R. § 545.6-4(a)(2) (1982). Texas' homestead laws indirectly prohibit RAM lending on property classified as homestead property because RAM lending depends entirely on the enforceability of liens taken in the owner's equity. Such laws were therefore in conflict with the FHLBB regulations existing in 1982. They also directly conflicted with the earlier expressed agency purpose in promulgating its regulations authorizing AMT lending—to "meet the needs of homeowners during different phases of their financial life cycles." 43 Fed.Reg. 59,336, 59,336 (1978)

Having reviewed the state of the law prior to 1983, we must now answer the question of whether the current OTS regulations, which have gone unchanged in many respects since the 1983 revision of the real estate lending regulations, manifest a contrary, non-preemptive intent.

We conclude that the FHLBB did not manifest an intent to end its preemption of inconsistent

state laws, such as Texas' homestead laws, in its 1983 revision of its real estate lending regulations. In particular, we note that the commentary preceding the publication of the final rules explicitly stated that the revision "d[id] not mean that any authority c[ould] no longer be exercised." 48 Fed.Reg. 23,032, 23,032 (1983). We further note that the preamble to the final regulations also explicitly states that "loan contract[s] may provide for negative amortization of a portion of the interest, or of all interest on a loan *such as a reverse annuity mortgage.* The substance of these provisions is unchanged from the Board's prior regulations." *Id.* at 23,037-38 (emphasis added). Thus, the ability of federal savings associations to engage in RAM lending, previously granted by 12 C.F.R. §§ 545.6-4 (1982), seems not to have been diminished by the elimination of that section in 1983.

Turning to the language of the current regulations, we find that those regulations, in keeping with the general philosophy of the FHLBB/OTS, contain only a general grant of authority to federal savings associations to "originate, invest in, sell, purchase, service, participate, or otherwise deal in ... loans made on the security of residential or nonresidential real estate, ... subject to the limitations of this part." 12 C.F.R. § 545.32 (1993). The regulations contain few direct references to RAMs or line of credit conversion mortgages. However, 12 C.F.R. § 545.32(b)(4) (1993) provides that, with certain limitations, "a real estate loan may be fully amortized, partially amortized, non-amortized, *or a line-of-credit loan,* and the loan contract may provide for the deferral and capitalization of a portion of the interest" (emphasis added). The regulation governing home loans authorizes federal associations to use loan contracts that "provide for the deferral and capitalization of all interest on loans to natural persons secured by borrower-occupied property and *on which periodic advances are being made.*" 12 C.F.R. § 545.33(a) (1993) (emphasis added). The regulation implementing the Parity Act authorizes housing creditors that are not commercial banks, credit unions, or federal savings associations to "make alternative mortgage transactions (as defined by [12 U.S.C. § 3802] and as further defined and described by applicable regulations identified herein) *notwithstanding any state constitution, law or regulation,*" 12 C.F.R. § 545.33(f) (1993) (emphasis added), thus suggesting broad authority to make such transactions on the part of federal associations as well. All these references support the inference that the OTS has continued the FHLBB's policy of permitting

federal savings associations to engage in RAM lending (including line of credit conversion mortgage lending) without interference from state laws such as Texas homestead law.

The fly in the ointment is 12 C.F.R. § 545.32(c) (1993), which provides a definition for use in determining whether a loan "is made on the security of real estate." One element of the definition of such a loan is that the "security interest ... may be enforced as a real estate mortgage or its equivalent pursuant to the law of the state in which the property is located." 12 C.F.R. § 545.32(c)(2) (1993). The district court relied exclusively on this provision in determining that the OTS regulations do not preempt Texas homestead law, and in fact incorporate that law as federal law. *First Gibraltar Bank,* 815 F.Supp. at 1014.

The history of this definitional section, however, indicates an agency purpose contrary to the district court's conclusion. The preamble to the 1983 revision of the regulations reveals that § 545.32(c) was adopted to deal with the problem of classifying property interests in time share units. Before the 1983 revision, loans on time share units were authorized only as consumer loans. 46 Fed.Reg. 23,032, 23,036 (1983). The FHLBB promulgated § 545.32(c) "in order to make clear what is required for a loan to be secured by real estate." *Id.* Under this revised regulation, then, "an association may make a real estate loan on the security of a time-share unit if the security property is real estate under state law." *Id.* Thus, the purpose of this section seems to have been to *broaden* rather than to constrict the range of transactions that federal associations could engage in under the real estate lending regulations. The state of Texas has not referred us to any authority beyond the words of § 545.32(c)(2) themselves for the proposition that that section was intended to cut back on federal associations' ability to engage in RAM or line of credit conversion mortgage lending, and we find none.

Additionally, we take note of the *de la Cuesta* Court's statement that

the incorporation of state law does not signify the inapplicability of federal law, for "a fundamental principle in our system of complex national polity" mandates that "the Constitution, laws, and treaties of the United States are as much a part of the law of every State as its own local laws and Constitution."

*de la Cuesta,* 458 U.S. at 157, 102 S.Ct. at 3024 (citations omitted). The Court was considering language in the FHLBB's regulations to the effect that rights and duties created by a due-on-sale

clause in a mortgage contract used by a federal savings association "shall be fixed and governed by that contract." *Id.* The appellees in *de la Cuesta* argued that this regulation demonstrated intent to incorporate state contract law rather than preempt it. The Court rejected this argument, explaining that incorporation of state contract law for the purpose of contract interpretation did not foreclose preemption of state law for other purposes, e.g., the enforceability of due-on-sale clauses. *Id.* Likewise, in our case, we may recognize that 12 C.F.R. § 545.32(c)(2) incorporates state law generally concerning the creation of an enforceable security interest in real property, and, at the same time, conclude that other provisions of the OTS's regulations have preempted one aspect of state law affecting the enforceability of a security interest in real property—the homestead law—in part.

Although specific references to these particular AMTs in the pertinent regulations are few, they lend support to the argument that § 545.32(c)(2) was not adopted with the intent of limiting the lending authority possessed by federal savings associations. In particular, we refer to § 545.32(b)(4), which authorizes federal savings associations to deal in line of credit loans, subject to the limitations of §§ 545.33 and 545.35. Had the OTS intended § 545.32(c)(2) to act as an incorporation of state law restricting the ability of federal savings associations to engage in line of credit conversion mortgage lending, presumably that section would also have been mentioned as a limiting section in § 545.32(b)(4).

Even assuming for the sake of argument that 12 C.F.R. § 545.32(c)(2) creates some ambiguity as to the authority of federal savings associations to engage in RAMs and line of credit conversion mortgages, we must give substantial deference to agency interpretations of these regulations that resolve the ambiguity. *de la Cuesta,* 458 U.S. at 158 & n. 13, 102 S.Ct. at 3025 & n. 13. The general rule is that agency interpretations of their own regulations are entitled to special deference if they are not plainly erroneous. *Udall,* 380 U.S. at 16-17, 85 S.Ct. at 801; *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). We have held that a published advisory letter from the general counsel of the FHLBB is entitled to deference as the interpretation of the agency. *See Gavey Properties/762 v. First Fin. Sav. & Loan Ass'n,* 845 F.2d 519, 521 (5th Cir.1988) ("To the extent that § 1730g(a) is ambiguous, this FHLBB

interpretation is entitled to deference provided it is reasonable."); *see also Espinoza v. Farah Mfg. Co.,* 414 U.S. 86, 94, 94 S.Ct. 334, 339, 38 L.Ed.2d 287 (1973) (referring to a letter from general counsel for the EEOC as the interpretation of the commission). In the context of statutory interpretation by an agency, however, the Supreme Court has indicated that numerous factors can influence the general principle, such as (1) whether the agency has maintained its position consistently, even if infrequently, (2) whether the agency interpretation is of long standing, (3) whether the public has relied upon the interpretation, (4) whether the interpretation involves a matter of public controversy, (5) whether the interpretation is based upon agency expertise in a complex area, (6) whether the agency itself has rulemaking authority, (7) whether Congress has known of and failed to repudiate the agency interpretation, (8) whether the agency has expressly addressed the application of the statute to the proposed issue, (9) whether the agency interpretation was rendered contemporaneously with the passage of the statute, and (10) the thoroughness, validity, and consistency of the agency's reasoning. *See Weber v. Heaney,* 793 F.Supp. 1438, 1455 (D.Minn.1992) (collecting cases), *aff'd,* 995 F.2d 872 (8th Cir.1993); Colin S. Diver, *Statutory Interpretation in the Administrative State,* 133 U.PA.L.REV. 549, 562 n. 95 (1985) (same).

Continuing to assume *arguendo* that the relevant regulations are ambiguous, we agree with the banks that the FHLBB Letter is entitled to deference as the interpretation of the agency under *Gavey Properties* if it is reasonable. *See Gavey Properties,* 845 F.2d at 521. *But see Colorado Pub. Utils. Comm'n v. Harmon,* 951 F.2d 1571, 1579 (10th Cir.1991) (holding that no deference is due an agency when it interprets statutes or regulations to preempt state law because preemption "involves matters of law—an area more within the expertise of the courts than within the expertise of [an administrative agency]"). The construction of these regulations expressed in the FHLBB Letter is, in our opinion, reasonable. Several factors support this conclusion, first among them being the consistency of this interpretation with the history of the regulation of RAMs and the absence of any conflicting agency interpretations during the lifetime of these regulations. We also recognize the expressed opinion of the FHLBB in its preamble to the 1983 amendments to the regulations that no diminution of the lending authority of federal savings associations was intended by the amendments.

The FHLBB Letter is supported by several portions of the OTS regulations that appear to assume that federal associations will be able to enter into and enforce RAMs and line of credit conversion mortgages. Section 545.32(b)(4) adverts to the power of savings associations to make real estate loans that are "line-of-credit" loans, subject to the limitations contained in §§ 545.33 (governing home loans) and 545.35 (governing other real estate loans). Notably absent is any reference to state law or § 545.32(c)(2). The regulation implementing the Parity Act, § 545.33(f), authorizes state lending institutions to use AMTs as defined and described by §§ 545.32(b)(3) and (b)(4), §§ 545.33(a) and (c), and § 563.99 "notwithstanding any state constitution, law or regulation." Section 545.32(c) is not referred to in this section as a limiting provision.

The FHLBB Letter, of course, is not without flaws. It admittedly fails to mention or incorporate 12 C.F.R. § 545.32(c) into its analysis. *See Federal Election Comm'n v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 37, 102 S.Ct. 38, 44, 70 L.Ed.2d 23 (1981) ("[T]he thoroughness, validity, and consistency of an agency's reasoning are factors that bear upon the amount of deference to be given an agency's ruling."). Whether we would have reached the same conclusion as the FHLBB, however, is not the question. To uphold its determination, we need not find that its interpretation is the only reasonable one, or even that it is the result we would have reached had we interpreted the regulations in the first instance. We need conclude only that it is a reasonable interpretation of the relevant provisions. *Aluminum Co. of Am. v. Central Lincoln Peoples' Util. Dist.,* 467 U.S. 380, 389, 104 S.Ct. 2472, 2479, 81 L.Ed.2d 301 (1984). That conclusion is warranted on this record.

We therefore defer to the opinion expressed in the FHLBB Letter. "Federal associations are authorized to offer, and if the need arises, to foreclose upon line of credit conversion mortgages which are secured by Texas homesteads, despite contrary state law." FHLBB Letter, *supra,* at 61,708. Likewise, "the authority of Federal associations to make reverse mortgages is governed solely by the HOLA and 12 C.F.R. § 545.1, and ... 12 C.F.R. § 545.2 establishes that the [OTS] did not cede its authority over such transactions by Federal associations to the states." *Id.* at 61,707 n. 9.

We reject the argument by the state of Texas that our holding condones "preemption by stealth." As we have seen, the FHLBB made its preemptive intent clear in promulgating the first AMT (including RAM) regulations in 1978; any slight ambiguity was resolved by the adoption of the express preemption provision in 12 C.F.R. § 545.6-4(a)(2) (1982). Any objection to the agency's decision could and should have been made during the notice-and-comment periods preceding the adoption of these sets of regulations. Additionally, the regulations have been amended several times since 1982, and parties opposed to the preemption of Texas homestead law could have made their voices heard at each stage of the regulations' evolution. The agencies responsible for regulating federal savings associations, however, have never manifested an intent to retreat from the clear preemption of Texas homestead law accomplished in the late 1970s and early 1980s.

The state argues that we may not find agency preemption in this case because Congress has expressly recognized the continued viability of Texas' homestead laws in recent legislation. For instance, 12 U.S.C. § 1428 directs the Federal Housing Finance Board to examine the laws of the various states from time to time relating to the operation of federal home loan banks, including "homestead and other rights." Additionally, some relatively recent amendments to the Internal Revenue Code now provide that

> [i]ndebtedness shall not fail to be treated as secured by any property solely because, under any applicable State or local homestead or other debtor protection law in effect on August 16, 1986, the security interest is ineffective or the enforceability of the security interest is restricted.

I.R.C. § 163(h)(4)(C). This provision's legislative history reveals that its purpose is to protect the deductibility of interest payments made

> on a loan secured by a recorded deed of trust, mortgage, or other security interest in a taxpayer's principal or second residence, in a State *such as Texas* where such security instrument will be rendered ineffective or the enforceability of such instrument will be otherwise restricted by State and local homestead or other debtor protection law *such as the Texas homestead law*[.]

S.REP.NO. 100-445, 100th Cong., 2d Sess. 37, *reprinted in* 1988 U.S.C.C.A.N. 4515, 4561 (emphases added).

Congress has assumed the continued vitality of Texas homestead law for the purposes of certain recent legislation—and with good reason. As we stated at the outset, the preemption sought

in this case involves the applicability of Texas homestead law to only two specific types of mortgage transactions; its applicability in other contexts, such as standard fixed-term, fixed-rate mortgages not for purchase money or property improvements, remains unquestioned. We do not believe that Congress has acted in any of the legislation cited by the state of Texas with the purpose of revising or repudiating the limited preemption undertaken by the FHLBB and the OTS. The fact that Congress has incorporated into legislation special provisions to take the peculiarities of Texas homestead law into account does not necessarily demonstrate that the FHLBB/OTS's decision to preempt that law "is not one that Congress would have sanctioned." *de la Cuesta,* 458 U.S. at 154, 102 S.Ct. at 3023 (quoting *United States v. Shimer,* 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)). It is hardly surprising that Congress was unaware of the limited preemption undertaken by the FHLBB and the OTS in the absence of any judicial pronouncements to that effect; we note that the clarifying interpretation rendered by the deputy general counsel for the FHLBB was not rendered until 1989, after Congress passed the section of the Internal Revenue Code cited above.

Congress, it may also be noted, has apparently not acted to repudiate the interpretation espoused in the FHLBB Letter since its publication. *Cf. Zemel v. Rusk,* 381 U.S. 1, 11, 85 S.Ct. 1271, 1278, 14 L.Ed.2d 179 (1965) ("Under some circumstances, Congress' failure to repeal or revise [an] administrative interpretation [of a statute] has been held to constitute persuasive evidence that that interpretation is the one intended by Congress."). Not only has Congress declined to expressly repudiate the OTS's preemption of Texas homestead law, but Congress also expressly recognized in the Parity Act that the FHLBB had "adopted regulations authorizing federally chartered depository institutions to engage in alternative mortgage financing." 12 U.S.C. § 3801(a)(3). As we have noted, at the time the Parity Act was passed FHLBB regulations included express authorization for federal associations to engage in RAM lending.

Although the persuasive force of the FHLBB Letter is not enhanced by the agency's failure to consider these acts of Congress suggesting the continued vitality of Texas homestead law in its interpretive analysis, we do not agree with the state's argument that Congress' actions cited above forbid the agency's interpretation in favor of preemption. Assuming that the pertinent regulations are

in fact ambiguous on the subject of preemption of Texas homestead law, we conclude that the interpretation of the agency as expressed in the FHLBB Letter is a reasonable one. The OTS has preempted Texas homestead law insofar as Texas law prohibits federal savings associations from taking enforceable security interests in homestead property through RAMs and line of credit conversion mortgages.

### b. Authority to Preempt

The second prong of our analysis under *de la Cuesta* requires us to ask whether the OTS's attempted preemption of Texas homestead law "is within the scope of the [agency's] delegated authority." *de la Cuesta,* 458 U.S. at 154, 102 S.Ct. at 3023. Express congressional authorization to displace state law is not required. *City of New York,* 486 U.S. at 64, 108 S.Ct. at 1642; *de la Cuesta,* 458 U.S. at 154, 102 S.Ct. at 3023. "[T]he best way of determining whether Congress intended the regulations of an administrative agency to displace state law is to examine the nature and scope of the authority granted by Congress to the agency." *Louisiana Pub. Serv. Comm'n,* 476 U.S. at 374, 106 S.Ct. at 1901. The Supreme Court has already told us that, in enacting the HOLA, "Congress delegated to the [FHLBB] ample authority to regulate the lending practices of federal savings and loans so as to further the Act's purposes." *de la Cuesta,* 458 U.S. at 159, 102 S.Ct. at 3025. Congress intended for the FHLBB to create and regulate "federal savings and loans so as to ensure that they would remain financially sound institutions able to supply financing for home construction and purchase." *Id.* at 168, 102 S.Ct. at 3030.

The *de la Cuesta* Court rejected several arguments that Congress had not delegated to the FHLBB the power to preempt state law with a uniform federal law governing the enforceability of due-on-sale clauses. The appellees argued that certain parts of the HOLA explicitly preempted various aspects of state law and that the FHLBB's authority to preempt was limited to those enumerated areas; the Court refused to read Congress' broad delegation of power to the FHLBB in 12 U.S.C. § 1464(a) as confined to areas of state law specifically described by the Act's other provisions. *de la Cuesta,* 458 U.S. at 162, 102 S.Ct. at 3027. The Court also relied on the HOLA's legislative history as supporting a broad delegation of plenary power to the FHLBB to regulate the

operations of federal savings and loans. *Id.* at 163-64, 102 S.Ct. at 3027. Finally, the Court noted that the mortgage lending practices of a savings association are a critical aspect of its "operation," over which the FHLBB unquestionably had jurisdiction. *Id.* at 167, 102 S.Ct. at 3029. The FHLBB's due-on-sale regulation was promulgated with the purpose of protecting the financial soundness of federal savings associations and thus enhancing the availability of credit for home construction and purchase. *Id.* at 168, 102 S.Ct. at 3030. The Court refused to pass on the advisability of the regulation allowing enforcement of due-on-sale clauses as a matter of economic policy except to hold that the regulation was not arbitrary or capricious. *Id.* at 169-70, 102 S.Ct. at 3030-31. The Court explicitly rejected the appellees' contention that the FHLBB's power to regulate federal savings associations "extends only to the associations' internal management and not to any external matters, such as their relationship with borrowers." *Id.* at 170 n. 23, 102 S.Ct. at 3031 n. 23.

The state of Texas focuses on part of the *de la Cuesta* Court's rationale for finding congressional delegation of the power claimed by the FHLBB to distinguish that case from the one at bar. The Court noted that the FHLBB's "due-on-sale policy is based on the view that due-on-sale clauses are essential to the financial soundness of federal savings and loans; preservation of the associations' very existence is obviously related to their internal management and is one of the functions delegated to the Board by Congress." *Id.* The state of Texas argues that the ability to make loans secured by equity in homestead property is not integral to the management of a federal savings association, nor is it essential to preserve the very existence of such associations. Plainly such associations have existed in Texas for many years despite the rigors imposed on them by Texas homestead law.

The state also relies on our opinion in *Gulf Fed. Sav. and Loan Ass'n v. Federal Home Loan Bank Bd.,* 651 F.2d 259 (5th Cir. Nov. 1981), *cert. denied,* 458 U.S. 1121, 102 S.Ct. 3509, 73 L.Ed.2d 1383 (1982), for the proposition that the FHLBB/OTS lacks the power to preempt state law except with respect to the internal management of federal savings associations. Gulf Federal, a federal savings and loan, used from its inception a method of calculating interest due on its loans known as the 365/360 method. *Id.* at 261. Four years after Gulf Federal was chartered, however,

its board of directors adopted a motion to change the savings and loan's interest calculation policy to the 365/365 method, which is slightly more favorable to borrowers. *Id.* Although the 365/365 method was incorporated into Gulf Federal loan agreement forms, the agreements also stated the precise amounts of interest to be paid calculated under the 365/360 method, and the savings and loan in fact continued to charge interest based on the 365/360 method. *Id.* at 261-62. Despite the fact that no borrowers complained of the discrepancy, the FHLBB investigated the situation and issued a cease-and-desist order against Gulf Federal ordering it to calculate interest under the 365/365 method described in its loan agreements and to reimburse borrowers for any overpayments that resulted from application of the 365/360 method. *Id.* at 262. Gulf Federal appealed from the cease-and-desist order. *Id.*

We first reversed the FHLBB's finding that Gulf Federal's practice of charging interest according to the 365/360 method regardless of contrary terms in the loan agreements constituted an "unsafe or unsound" practice within the meaning of the statute granting the FHLBB cease and desist authority. *Id.* at 263; *see also id.* at 264 ("The breadth of the "unsafe or unsound practice' formula is restricted by its limitation to practices with a reasonably direct effect on an association's financial soundness."). We also rejected the FHLBB's contention that it was entitled to issue the cease-and-desist order because Gulf Federal was violating a law, holding that Gulf Federal had not breached the loan agreements under either federal common law or Louisiana law. *Id.* at 266-67. The state of Texas now relies on our discussion of the federal common law argument, in which the FHLBB contended that Congress had preempted state law generally in matters relating to federal savings associations. *Id.* at 266. We rejected this argument, concluding that the cases relied upon by the FHLBB stood only for the proposition that "federal law governs the *internal management* of federal savings and loan institutions." *Id.* We observed that Gulf Federal's conduct vis-a-vis its borrowers had nothing to do with the internal management of the association and that its loan contracts did not implicate the sound management of the association or the insurance liability of the government, nor did those contracts require a uniform federal rule to assure the sound management of such associations. *Id.*

The banks respond that our *Gulf Federal* decision was criticized by the Supreme Court in *de la Cuesta:*

> We therefore reject appellees' contention that the Board's power to regulate federal savings and loans extends only to the associations' internal management and not to any external matters, such as their relationship with borrowers. Although one federal ... court[ ] ha[s] drawn this distinction, [citing *Gulf Federal* ], we find no support in the language of the HOLA or its legislative history for such restriction on the Board's authority.

*de la Cuesta,* 458 U.S. at 170 n. 23, 102 S.Ct. at 3031 n. 23. It seem s plain, then, that the *de la Cuesta* Court recognized that the FHLBB possessed the power to preempt state laws affecting the relationship between federal associations and their borrowers; indeed, the Court held that the FHLBB could adopt a uniform federal rule to regulate the effect of due-on-sale clauses agreed to by the parties. *Gulf Federal* is thus not good authority for the proposition that the power delegated by Congress to the FHLBB was limited solely to the internal management of federal savings associations in light of *de la Cuesta.*

We believe that the argument put forward by the state of Texas—essentially that the authorization of the OTS to preempt state law is limited to measures directly related to maintaining the financial soundness of federal associations—is an overly narrow interpretation of Congress' intent in enacting the HOLA and creating the FHLBB. Clearly part of Congress' purpose was to protect the integrity of federal associations through agency supervision. This purpose, however, was only a means to an end. An overarching purpose of the HOLA, which was enacted during the Great Depression, was to provide the country with sources of housing financing at a time when "more than half the counties in the country, containing almost one-fifth of the total population, were without home-financing institutions." *Id.* 458 U.S. at 159-60, 102 S.Ct. at 3026. That purpose has been capsulized and expanded in 12 U.S.C. § 1464(a), which authorizes the OTS to regulate the organization and operation of federal savings associations "[i]n order to provide thrift institutions for the deposit of funds and for the extension of credit for homes *and other goods and services* " (emphasis added). The decision of the FHLBB/OTS to preempt Texas homestead law in the case of RAMs and line of credit conversion mort gages, thereby greatly expanding the pool of collateral available to Texans for borrowing purposes, is entirely consistent with the HOLA's purpose of

ensuring the broadest availability of credit for general consumer purposes.

Broad authority to preempt Texas' homestead law is also consistent with one of Congress' express findings leading to the enactment of the Parity Act: "The Congress hereby finds that ... alternative mortgage transactions are essential to the provision of an adequate supply of credit secured by residential property necessary to meet the demand expected during the 1980's[.]" 12 U.S.C. § 3801(a)(2). Although the Parity Act's definition of AMTs, found at 12 U.S.C. § 3802(1), did not expressly describe mortgages secured by accumulated home equity, Congress later authorized HUD to insure a number of home equity conversion mortgages in a demonstration program for elderly homeowners and explicitly cited the Parity Act as a source of statutory authority for housing creditors to make such loans. 12 U.S.C. § 1715z-20; *see id.* § 1715z-20(b)(3) ("The term "home equity conversion mortgage' means a first mortgage which provides for future payments to the homeowner based on accumulated equity and which a housing creditor ... is authorized to make ... in accordance with section 3803 of this title, notwithstanding any State constitution, law, or regulation...."). These statutes provide additional support for the position that Congress intended to empower the FHLBB/OTS to preempt state laws that interfere with the ability of federal savings associations to engage in RAM or line of credit conversion mortgage lending.

The banks also point out that this circuit has accorded deference to an agency's determination of its own statutory authority. *See NCNB Tex. Nat'l Bank v. Cowden,* 895 F.2d 1488, 1494 (5th Cir.1990) ("As the cases dealing with the pre-emptive effect of agency actions suggest, substantial deference to an agency's determination of its authority may be appropriate."); *Western Coal Traffic League v. United States,* 719 F.2d 772, 777 (5th Cir.1983) ("We begin, as we must, with a recognition of the limited role this Court plays in reviewing an administrative agency's construction of its statutory authority...."), *cert. denied,* 466 U.S. 953, 104 S.Ct. 2160, 80 L.Ed.2d 545 (1984). By asserting the position that its regulations have preempted Texas homestead law, both in the FHLBB Letter and in the OTS amicus brief filed in the instant cause, the agency has implicitly interpreted its governing statutes to authorize such preemption. This interpretation is not unreasonable in light of the broad mandate given the OTS by Congress in its governing statutes. *See,*

*e.g.,* 12 U.S.C. § 1464(a) (authorizing the Director of the OTS to issue regulations providing for the organization and operation of federal savings associations "giving primary consideration of the best practices of thrift institutions in the United States").

We therefore conclude that the OTS did not exceed its authority in preempting Texas homestead law insofar as that law prohibits federal savings associations from engaging in RAMs and line of credit conversion mortgages and thereby taking enforceable security interests in real estate that qualifies as homestead property under Texas law.

5. *Application of Preemption Doctrine: Nonfederally Chartered Savings Associations*

We next turn to the issue relevant to plaintiff Beneficial, which is whether the federal statutes and regulations at issue preempt Texas homestead law so as to allow nonfederally chartered savings associations to engage in RAM and line of credit conversion mortgage lending. As we have observed, the Parity Act was enacted with the express purpose of putting nonfederally chartered housing lenders on a level playing field with federal savings associations "by authorizing all housing creditors to make, purchase, and enforce alternative mortgage transactions so long as the transactions are in conformity with the regulations issued by the Federal agencies." 12 U.S.C. § 3801(b). The Director of the OTS has authorized nonfederally chartered housing creditors (excluding banks and credit unions, which fall outside the regulatory purview of the OTS) to use loan contracts containing flexible amortization arrangements (including line-of-credit loans) under 12 C.F.R. § 545.32(b)(4) and loan contracts "provid[ing] for the deferral and capitalization of all interest on loans to natural persons secured by borrower-occupied property and on which periodic advances are being made" under 12 C.F.R. § 545.33(a). *See* 12 C.F.R. § 545.33(f) (1993) (designating these and certain other regulations as "appropriate and applicable" to the exercise of AMT lending authority by state housing creditors).

Reviewing the history of these regulations, we find that, after passage of the Parity Act, the FHLBB published a notice to housing creditors regarding AMTs in the Federal Register. 47 Fed.Reg. 51,732 (1982). The notice states that "[h]ousing creditors that are not commercial banks, credit unions or federal associations are authorized to make alternative mortgage loans secured by

residential real estate [with certain limitations.]" *Id.* at 51,733. The notice cites 47 Fed.Reg. 36,612 (1982) for a "full description of the types of mortgage transactions authorized." *Id.* Turning to that publication, we find that, "[s]ince 1979, when the Board permitted the issuance nation-wide of variable-payment loans, each alternative mortgage instrument involving payment adjustment has been authorized.... The loan types so authorized [include] the reverse-annuity mortgage (RAM)...." 47 Fed.Reg. 36,612, 36,612 (1982). Ultimately, the notice appeared as an appendix to 12 C.F.R. § 545 (1984), which included a general grant of authority to state housing creditors to "make alternative mortgage transactions (as defined by [12 U.S.C. § 3802] )." The administrative history of the regulations implementing the Parity Act thus demonstrate the intent of the FHLBB to put state housing creditors on a par with federal savings associations with respect to RAM lending.

The state of Texas argues that the regulations designated as applicable to state housing creditors in 12 C.F.R. § 545.33(f) authorize "only flexible interest rates, adjustments to interest rates, flexible amortization, and disclosure of the adjustable rates and terms." We concur; however, the concept of flexible amortization plainly includes the particular AMTs at issue in the instant case. *See* 12 C.F.R. § 545.32(b)(4) (1993) ("[A] real estate loan may be fully amortized, partially amortized, nonamortized, or a line-of-credit loan...."); *id.* § 545.33(a) (referring under the heading of "Amortization" to "loans to natural persons secured by borrower-occupied property and on which periodic advances are being made"); *id.* § 545.33(c)(4) (referring to notice requirements required for line of credit loans). Thus, the state's narrow reading of the authority granted to state housing creditors by § 545.33(f) is not tenable. Neither do we find persuasive the state's argument that Congress intended for the Parity Act to preempt only state laws prohibiting adjustable interest rates. Congress broadly intended to create parity between state and federal housing creditors, and it enacted the Parity Act recognizing that federal savings associations had been given the authority to engage in AMT lending. 12 U.S.C. §§ 3801(b), (a)(3). As we have already noted, Congress also later authorized the Secretary of HUD to implement a demonstration program under which the Secretary would federally insure a number of home equity conversion mortgages for the elderly. 12 U.S.C. § 1715z-20. The program defined such a mortgage as one that "provides for future payments to the

homeowner based on accumulated equity" and incorporated 12 U.S.C. § 3803 as a source of authority for housing creditors to make such loans "notwithstanding any State constitution, law, or regulation" to the contrary. 12 U.S.C. § 1715z-20(b)(3).

In light of Congress' purposes in enacting the Parity Act, and in light of the broad language of that Act and Congress' explicit recognition of the authority to issue home equity conversion mortgages in 12 U.S.C. § 1715z-20, we conclude that Congress empowered the OTS to authorize state housing creditors (as defined in 12 U.S.C. § 3803(a)(3)) to engage in RAM and line of credit conversion mortgage lending through the Parity Act. Thus, these housing creditors may engage in those types of transactions, consistent with OTS regulations as specified in 12 C.F.R. § 545.33(f).

## IV. CONCLUSION

For the foregoing reasons we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.