446

663 A.2d 1272

IDEAL FEDERAL SAVINGS BANK et al.

v.

Madeline MURPHY et al.

No. 1, Sept. Term, 1995.

Court of Appeals of Maryland.

Aug. 25, 1995.

Charles M. Kerr (Kathleen M. McDonald, Irwin, Kerr, Green, McDonald and Dexter; Gerald A. Smith, all on brief), Baltimore, for petitioners.

John H. Morris, Jr. (William H. Murphy, Jr., William H. Murphy, Jr. & Associates, all on brief), Baltimore, for respondents.

Carolyn B. Lieberman, Chief Counsel; Thomas J. Segal, Deputy Chief Counsel; Aaron B. Kahn, Principal Litigation Counsel; Teresa A. Scott, Sr. Trial Atty., Washington, DC, for amicus curiae the Office of Thrift Supervision.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, RAKER, JOHN F. McAULIFFE (retired, specially assigned), JJ.

CHASANOW, Judge.

The issue we must resolve in the instant case is whether the Court of Special Appeals erred in holding invalid, as against Maryland public policy, an election of directors for a federally-chartered savings and loan institution where members were required to vote "for" or "against" each candidate. In the election at issue, there were only ten candidates nominated for the 15 director vacancies and four of those candidates were declared not elected when they received more "against" votes than "for" votes. We must reverse the intermediate appellate court because even if there is a Maryland legislative policy disfavoring "negative" voting, it would not be applicable to this election for directors of a federally-chartered institution. The overseeing federal regulatory agency's interpretation of its federal charter form provision as precluding a plurality vote for directors and permitting "for" and "against" votes preempts any Maryland statutory provision which may be to the contrary.

## I.

Prior to April 6, 1987, Ideal Federal Savings Bank (Ideal) had been a state-chartered, savings institution. Because of the savings and loan crisis in Maryland in the mid–80's, Ideal was required to obtain a federal charter and federal insurance in order to remain in business. Ideal's charter and bylaws were adopted from the form for charters and bylaws for federal mutual savings associations found in Title 12 of the Code of Federal Regulations § 544.1. *See* 12 C.F.R. § 544.1 (1995).

On January 21, 1988, Ideal held its first organizational meeting of its members under its new federal charter. A primary purpose of that meeting was to elect a board of directors. Ideal's charter provided for a board of directors of not less than five nor more than 15. The bylaws provided that the number of directors should be 15.

Former Baltimore City Solicitor Benjamin L. Brown, Esquire, the acting chairman for the meeting, advised the members at the meeting that, under Ideal's new federal charter and bylaws, the conduct of the meeting and method of voting for Ideal's board of directors were governed by *Robert's Rules of Order. See Robert's Rules of Order* (Henry Robert, III & William J. Evans eds., 1990). Mr. Brown informed the members that they were required to vote by written ballot and that they should vote "for," "against," or "abstain," as to each candidate for director. To be elected, the candidate would have to receive a majority of "for" votes cast in his or her election, so that unless a candidate received more "for" votes than "against" votes, he or she could not be elected to a position on the board; abstentions were not to be counted. Mr. Brown told the members that Ideal's nominating committee had nominated eight people to run for the 15 director positions, and that the members had nominated two additional persons, H. Russell Frisby and Martin P. Welch, in accordance with the nomination process dictated by Ideal's federal charter.

The members voted [1] as follows:

| Name | For | Against | Abstaining |
|------|-----|---------|------------|
| B.L. Brown | 4,360 | –0– | –0– |
| H.R. Frisby | 1,157 | 3,203 | –0– |
| E.G. Lansey | 3,905 | 455 | –0– |
| Y.F. Lansey | 4,360 | –0– | –0– |
| L.L. Lewis [2] | 1,473 | 3,841 | 46 |
| A.W. Murphy | 498 | 3,862 | –0– |
| M.W. Murphy | 566 | 3,794 | –0– |
| C.M. Sherrard | 3,886 | 455 | 19 |
| J.F. Turpin | 3,810 | 531 | 19 |
| M.P. Welch | 3,606 | 711 | 43 |

As per the vote tallies, six of the ten nominees received a majority of the votes cast, and they were declared elected by Mr. Brown. Madeline Murphy, H. Russell Frisby, Arthur Murphy, and Leslie Lewis did not receive a majority of the votes cast, and they were declared not elected directors.

The four candidates for director who were denied seats on the board filed suit in the Circuit Court for Baltimore City against Ideal seeking a declaratory judgment that they had been duly elected to the board of directors at the January 21, 1988 meeting. We shall call that case the Madeline Murphy case. The sole issue in that case was the validity of the "for" and "against" voting method used to elect directors at the January 21, 1988 meeting.

While the Madeline Murphy case was pending, and just prior to what was scheduled to be Ideal's second annual membership meeting, another somewhat related lawsuit was filed against Ideal by William Murphy, Sr. in the Circuit Court for Baltimore City. We shall call that second lawsuit the William Murphy case. The two cases will collectively be

---

**1.** Section 6 of Ideal's charter provides that "[i]n the consideration of all questions requiring action by the members of the [association], each holder of an account shall be permitted to cast one vote for each $100, or fraction thereof, of the withdrawal value of the member's account" to a maximum of 1,000 votes.

**2.** There appears to be an incorrect tally of the vote for L.L. Lewis because, as the votes appear, 5,360 votes were cast when there should have only been 4,360 votes cast.

called the Murphy cases. William Murphy, Sr. was a member of Ideal and was a candidate for director at the then-scheduled second annual meeting. He requested that Ideal forward to all members, at his expense, a letter he prepared recommending a slate of directors which also may have amounted to a proxy solicitation. Ideal refused that request and Mr. Murphy sought declaratory and injunctive relief. Shortly thereafter, Mr. Murphy amended his complaint and added allegations that the election of only six directors at the January 21, 1988 shareholders meeting was invalid and that a March, 1988 attempt by the six directors to amend Ideal's bylaws and reduce the number of directors from 15 to seven was also invalid.[3]

On January 19, 1989, Judge Thomas Ward held a hearing on the interlocutory injunctive relief requested by William Murphy, Sr. Prior to Judge Ward's entering any order in the William Murphy case or in the Madeline Murphy case, Ideal filed with the United States District Court for the District of Maryland a Notice of Removal of the William Murphy case. Ideal did not seek to remove the Madeline Murphy case although there was some question as to whether the two cases were consolidated. William Murphy, Sr. maintained that his case was improperly removed to the federal court. We shall omit the many motions and arguments that are not necessary to resolve the issues before this Court. We note that, as the Murphys candidly acknowledged in their brief in this Court, "[t]he only constant in this now seven-year struggle for the

---

**3.** The trial court made no determination whether the old corporation was merged into or extinguished by the new federally-chartered corporation. *See* Maryland Code (1980, 1992 Repl.Vol.), Financial Institutions Article, §§ 9–613 through 9–615 dealing with conversion of state-chartered savings and loan associations into federally-chartered associations. The issue of whether the old corporate directors, who were not elected, could be carryover directors was not raised or argued in the circuit court.

We express no opinion on the validity of the vote by six directors to reduce the number of directors set by the bylaws at 15 but suggest that alternatives might have been to call another membership meeting or have the existing directors fill the vacancies. *See, e.g.,* Md.Code (1975, 1993 Repl.Vol.), Corporations and Associations Art., § 2–407.

control of Ideal is the willingness of the parties to take any favorable position without close attention to how the position might be inconsistent with other positions the party has taken."

## VOLUNTARY DISMISSAL OF THE WILLIAM MURPHY CASE

Prior to filing an answer to the William Murphy case, Ideal moved to dismiss, alleging that the Federal Home Loan Bank Board (FHLBB) had primary jurisdiction over those claims. Instead of responding to this motion, William Murphy, Sr. filed a notice of dismissal, pursuant to Fed.R.Civ.P. 41(a)(1)(i), voluntarily dismissing his case. Fed.R.Civ.P. 41(a) provides in pertinent part:

"(a) **Voluntary Dismissal: Effect Thereof.**

(1) *By Plaintiff; By Stipulation.* Subject to the provisions of Rule 23(e), of Rule 66, and of any statute of the United States, an action may be dismissed by the plaintiff without order of court (i) by filing a notice of dismissal at any time before service by the adverse party of an answer or of a motion for summary judgment, whichever first occurs, or (ii) by filing a stipulation of dismissal signed by all parties who have appeared in the action. Unless otherwise stated in the notice of dismissal or stipulation, the dismissal is without prejudice, except that a notice of dismissal operates as an adjudication upon the merits when filed by a plaintiff who has once dismissed in any court of the United States or of any state an action based on or including the same claim."

That rule is similar to Maryland Rule 2–506, which would apply if in fact removal had been improper and which provides in pertinent part:

"(a) **By Notice of Dismissal or Stipulation.**—Except as otherwise provided in these rules or by statute, a plaintiff may dismiss an action without leave of court (1) by filing a notice of dismissal at any time before the adverse party files an answer or a motion for summary judgment or (2) by

filing a stipulation of dismissal signed by all parties who have appeared in the action."

Although an order of court was not necessary to dismiss the suit since no answer or motion for summary judgment had been filed, Judge Frank Kaufman of the United States District Court for the District of Maryland initialed the notice of dismissal and noted it as "approved."

What happened following the notice of dismissal is summarized in the respondent's brief in this Court:

"After the federal court first accepted the dismissal, the procedural posturing between the parties continued. Ideal sought attorneys' fees, alleging that the case had been dismissed only to avoid removal. Ideal also moved to vacate the dismissal. In response to that Motion, Mr. Murphy contended that Ideal had wrongfully removed that case to federal court.

In the thicket of accusations and counter-accusations between the parties, Judge Kaufman of the United States District Court for the District of Maryland sent the parties packing, back to the Circuit Court for Baltimore City."

William Murphy, Sr. contends that Judge Kaufman "remanded to state court the very case whose dismissal he had initially accepted, *apparently granting Ideal's motion to vacate the dismissal.*" (Emphasis added). Although it did not reach any of the issues raised by the William Murphy case, the Court of Special Appeals apparently agreed with this contention. That court noted in a footnote:

"Appellees contend that the *William Murphy* case was dismissed in federal court. The case was, in fact, dismissed at one point. Appellees, however, later moved to vacate that dismissal. That motion to vacate was pending when the federal court remanded the case to state court. We are persuaded that, by remanding the case, the federal court vacated the dismissal, as it had been requested to do by appellees. Appellees also complain that, because there was no ruling on their motion to vacate, they had no official

decision on which to appeal. In light of our holding, however, that complaint is irrelevant."

*Madeline Murphy et al. v. Ideal Federal Savings Bank et al.,* Slip Op. No. 367 at 11, n. 9 (Md.Ct.Spec.App. Oct. 28, 1994).

We disagree that there was, or could have been, an implied vacating of the voluntary dismissal merely because the case was remanded back to the state court. Under Fed.R.Civ.P. 41(a)(1)(i), a notice of voluntary dismissal, once filed with the clerk, deprives the court of jurisdiction to enter most orders unless the dismissal is vacated, pursuant to Fed.R.Civ.P. 60(b). *See Randall v. Merrill Lynch,* 820 F.2d 1317, 1320 (D.C.Cir. 1987), *cert. denied,* 484 U.S. 1027, 108 S.Ct. 753, 98 L.Ed.2d 765 (1988); *Smith v. Phillips,* 881 F.2d 902, 904 (10th Cir. 1989). What Judge Kaufman seemingly did in the instant case was remand the requests for attorneys' fees. William Murphy, Sr.'s prayers for injunctive and declaratory relief were, and still remain, dismissed. It is obvious that, if Judge Kaufman intended to vacate the dismissal, he would have expressly done so. Thus, the dismissal was never vacated pursuant to Fed.R.Civ.P. 60(b). The effect of Mr. Murphy's voluntary dismissal was to withdraw his complaint. Therefore, none of the issues raised in that complaint are before this Court.

## THE DECISIONS BELOW IN THE
## MADELINE MURPHY CASE

On January 17, 1990, the day before Ideal's third scheduled annual meeting and election of its board of directors, the Madeline Murphy plaintiffs filed a motion for summary judgment and a motion to enjoin the scheduled January 17, 1990 membership meeting.[4] The Madeline Murphy case and what-

---

4. We are told by the parties that the only annual meeting Ideal ever held under its federal charter was in January, 1988. By stipulation, the parties ultimately agreed that Ideal would not hold the January, 1990 annual meeting and that a stand-still agreement would be in place until a final decision in the case. That agreement was incorporated into a court order.

ever remained of the remanded William Murphy case were assigned to Judge Mabel Houze Hubbard of the Circuit Court for Baltimore City. We will not set forth in detail all of the proceedings before Judge Hubbard or her findings in the William Murphy case since, as we have indicated, that case was dismissed and should not have been considered by Judge Hubbard. The finding made by Judge Hubbard that is properly before this Court is her determination on December 29, 1993, that the method of voting for directors employed by Ideal at the January 21, 1988 annual meeting was proper and resulted in the election of only six directors. William Murphy, Sr., Madeline Murphy, Arthur Murphy, and Leslie Lewis [5] appealed this decision to the Court of Special Appeals. Ideal appealed Judge Hubbard's decision in the William Murphy case to the Court of Special Appeals, arguing that Judge Hubbard was without jurisdiction to hear that case because that case was dismissed. In an unreported *per curiam* opinion, the intermediate appellate court held that based on the "public policy" expressed in Maryland Code (1975, 1993 Repl. Vol.), Corporations and Associations Article, § 2–404, the method of voting used at the January 21, 1988 membership meeting was invalid [6] and that all ten of the nominated directors were elected at that meeting. The intermediate appellate court stated:

"The use of negative voting in the election of directors is inconsistent with the public policy of this state. That public policy is found in Md.Corps. & Ass'ns Code Ann. (1993 repl. vol.). Section 2–404 of that article provides in part:

'(c) *Manner of voting.*—Each share of stock may be voted for as many individuals as there are directors to be

---

**5.** H. Russell Frisby did not join in the appeal.

**6.** The fact that fewer directors were elected than there were vacancies does not invalidate the election of those directors who received a majority of the votes cast. *See* 2 William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 291, at 94 (perm. ed. rev. vol. 1990) ("An election of fewer directors than the number which the meeting was called to elect is valid as to those actually elected.").

elected and for whose election the share is entitled to be voted.

(d) *Plurality vote.*—Unless the charter or bylaws of a corporation provide otherwise, a plurality of all the votes cast at a meeting at which a quorum is present is sufficient to elect a director.'

Subsection (c) provides for 'positive' voting, not 'negative' voting. Although it is commonplace to allow a vote to be cast 'for' or 'against' a proposition or motion, this court finds no support for appellee's argument that the same method should be employed in the election of directors.

&ast; &ast; &ast; &ast; &ast; &ast;

The public policy of Maryland favors the presence of minority shareholders on a board of directors. This is evidenced by the plurality requirement of Md.Code Ann. (1993 repl. vol.), § 2–204(d) of the Corporations and Associations Article which appears above.

&ast; &ast; &ast; &ast; &ast; &ast;

Ideal had no right to use negative voting and to require that each director receive a majority vote, rather than a plurality vote, in order to serve on the board."

*Madeline Murphy et al.,* Slip Op. No. 367 at 5, 8.

## II.

Action by stockholders generally requires a majority of a quorum of stockholders (or, as in the instant case, members).[7] In Maryland, that general rule is codified in Md.Code (1975, 1993 Repl.Vol.), Corporations and Associations Art., §§ 2–506 and 2–404(c). Section 2–506 provides:

"(a) *General rule.*—Unless this article or the charter of a corporation provides otherwise, at a meeting of stockholders:

---

7. We note that Ideal is probably a nonstock membership corporation. Under Md.Code (1975, 1993 Repl.Vol.), Corporations and Associations Art., § 5–201, the provisions of the Maryland General Corporation Law apply unless provided otherwise.

(1) The presence in person or by proxy of stockholders entitled to cast a majority of all the votes entitled to be cast at the meeting constitutes a quorum; and

(2) A majority of all the votes cast at a meeting at which a quorum is present is sufficient to approve any matter which properly comes before the meeting.

(b) *Two or more classes of stock entitled to vote separately.*—Subject to other provisions of this article, unless the charter of a corporation provides otherwise, if two or more classes of stock are entitled to vote separately on any matter for which this article requires approval by two thirds of all the votes entitled to be cast, the matter shall be approved by two thirds of all the votes of each class."

Section 2–404(c) provides:

"(c) *Manner of voting.*—Each share of stock may be voted for as many individuals as there are directors to be elected and for whose election the share is entitled to be voted."

In 1981, the legislature adopted a presumptive exception to that general rule applicable to the election of directors of a corporation. The 1981 statute, codified at § 2–404(d), stated:

"Unless the charter or bylaws of a corporation provide otherwise, a plurality of all the votes cast at a meeting at which a quorum is present is sufficient to elect a director."

Chapter 122 of the Acts of 1981.

The purpose of § 2–404(d) was stated in an "Explanation of Senate Bill No. 659 Vote Required to Elect Directors," which accompanied the proposed legislation and stated:

"The purpose of the Bill is to provide that corporate directors may be elected by a plurality of the votes cast if a quorum is present.

This would provide an exception to Section 2–506 of the Corporations and Associations Article which requires a majority of all votes cast to approve any matter.

The Bill is needed because in some cases it is possible that less than the required number of nominees would

receive a majority of the votes cast—when, for instance, there are more nominees than directors. In that event the nominees that received a majority of the votes would fill the remaining directorships, not the stockholders. It is also possible that no nominees would receive a majority of the votes cast, in which case there would be no election and the current `directors could continue to serve until the next annual meeting of stockholders. The Bill would essentially eliminate the possibility of these bizarre occurrences."

As the Court of Special Appeals noted, a plurality has been defined as:

"The excess of votes cast for one candidate over those cast for any other. Where there are only two candidates, he who receives the greater number of the votes cast is said to have a *majority;* when there are more than two competitors for the same office, the person who receives the greatest number of votes has a *plurality,* but he has not a majority unless he receives a greater number of votes than those cast for all his competitors combined, or, in other words, more than one-half of the total number of votes cast."

*Madeline Murphy et al.,* Slip Op. No. 367 at 8–9 (quoting *Black's Law Dictionary* 1039 (5th ed. 1979)) (emphasis in *Black's* ). Ideal contends that the Court of Special Appeals fundamentally misperceived the meaning of the term "plurality" and that no issue of plurality voting is present in this case since the term only applies where three or more persons or choices are available on a single question. It reasons that especially where, as here, there were more vacancies than directors nominated, there was therefore only one candidate for each office and each nominated candidate must be elected by a majority of the votes cast. We need not, in the instant case, decide the issue of whether "for" and "against" voting for directors is prohibited by § 2–404(d) since we find that that

section is inapplicable to Ideal.[8]

■ Section 6 of Ideal's charter provides that at membership meetings "[a] majority of all votes cast at any meeting of the members shall determine any question." We need not reach the issue of whether, under Maryland law, Ideal's general charter provision regarding voting would not supersede the specific statutory provision in § 2–404(d) authorizing a plurality election for directors "[u]nless the charter or bylaws ... provide otherwise." Because Ideal is federally-chartered, however, even if § 2–404(d) or its "policy" might otherwise be deemed applicable, it would be preempted by federal law.

■ It is well established that the internal management of savings and loans chartered under the Home Owners Loan Act (HOLA) 12 U.S.C. § 1461 *et seq.* (1988) is governed solely by federal law, and that state law is preempted if it conflicts with either HOLA and the regulations promulgated thereunder by the Office of Thrift Supervision (OTS) (until 1989 referred to as the FHLBB) or federal common law. *See Fidelity Federal Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 162, 102 S.Ct. 3014, 3027, 73 L.Ed.2d 664, 680 (1982) ("Congress expressly contemplated, and approved, the [FHLBB's] promulgation of regulations superseding state law."); *First Gibraltar Bank, FSB v. Morales*, 19 F.3d 1032, 1051 (5th Cir.1994) (finding that an FHLBB/OTS decision preempted Texas homestead law); *Home Mortg. Bank v. Ryan*, 986 F.2d 372, 375 (10th Cir.1993) (OTS regulations regarding conversion of state-chartered savings associations to state-chartered banks preempt state statute); *Smallwood v. Office of Thrift Supervision*, 925 F.2d 894, 898 (6th Cir.1991) (holding that OTS statute authorizing conversion of mutual savings association to federal stock association impliedly preempts state law); *Kupiec v. Republic Federal Savings & Loan Ass'n*, 512 F.2d 147, 153 (7th Cir.1975) (bylaw promul-

---

**8.** It is perhaps noteworthy that directors can be removed without cause by a majority vote of stockholders. *See* Md.Code (1975, 1993 Repl. Vol.), Corporations and Associations Art., § 2–406(a).

gated by the FHLBB and adopted by federal savings and loan association which limited use of association's membership records held to supersede common-law right of members to inspect or copy membership list); *Murphy v. Colonial Federal Savings & Loan Association,* 388 F.2d 609, 611 (2d Cir.1967) (noting that "Congress could hardly have intended that the rights of members of federal savings and loan associations to fair elections should vary with quirks of local law").[9]

Congress authorized OTS and its predecessor, FHLBB,[10] to charter federal savings associations and regulate their operations. *See, e.g.,* 12 U.S.C. § 1464 (1988); 12 U.S.C. § 1463 (Supp. II 1990). FHLBB regulations have been characterized as governing " 'the powers and operations of every Federal savings and loan association from its cradle to its corporate grave.' " *de la Cuesta,* 458 U.S. at 145, 102 S.Ct. at 3018, 73 L.Ed.2d at 670 (quoting *People, etc. v. Coast Federal Sav. & Loan Ass'n,* 98 F.Supp. 311, 316 (S.D.Cal.1951)).

Ideal's Charter was adopted from the charter form for charters for federal mutual savings associations found in 12 C.F.R. § 544.1 (1995). That section and the Ideal charter provide:

---

9. Ideal also suggests that since Section 2 of its bylaws requires that "annual and special meetings shall be conducted in accordance with the most recent edition of Robert's Rules of Order" this prohibited a plurality election because *Robert's Rules* § 43 provides that "[a] plurality that is not a majority never chooses a proposition or elects anyone to office, except by virtue of a special rule previously adopted." We reject this contention. Md.Code (1975, 1993 Repl.Vol.), Corporations and Associations Art., § 2–404(d), which makes a plurality vote sufficient to elect a director is a specific "special provision previously adopted" and controls over the statement in *Robert's Rules* regarding voting and elections in general.

10. At the time that Ideal was granted its federal charter, Ideal was regulated by the Office of Thrift Supervision's (OTS) predecessor, the Federal Home Loan Bank Board (FHLBB). However, the FHLBB was dissolved and replaced by the OTS in 1989 with the passage of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA). *See* 12 U.S.C. § 1462a—1464 (Supp. II 1990); *see also First Gibraltar Bank, FSB v. Morales,* 19 F.3d 1032, 1041 (5th Cir.1994).

"Any number of members present and voting, represented in person or by proxy, at a regular or special meeting of the members shall constitute a quorum. A majority of all votes cast at any meeting of the members shall determine *any* question." (Emphasis added).

*See* 12 C.F.R. § 544.1, at 67, 765 (1995). The OTS, which was permitted to filed an *amicus curiae* brief, interprets that provision in 12 C.F.R. § 544.1 as covering elections of directors as well as all other matters requiring a vote of the members of an association.

■ In *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616, 625 (1965), the Supreme Court of the United States noted that:

"When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration.

\*     \*     \*     \*     \*     \*

When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order."

*See also First Gibraltar Bank, FSB,* 19 F.3d at 1047. Additionally, an agency's interpretation of an administrative regulation is "of controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700, 1702 (1945).

The Ideal charter, which is a verbatim adoption of the charter provisions in 12 C.F.R. § 544.1, is interpreted by OTS as permitting Ideal to require majority approval before seating a person on its board of directors. Further, as OTS points out in its brief:

"First, although Ideal's bylaws at the time of the board elections provided that the number of directors should be fifteen, both Ideal's charter and the charter set forth in 12 C.F.R. § 544.1 provided that the number of directors could range from five to fifteen. Thus, both Ideal and the OTS

appreciated that an election could result in the seating of less than 15 board members. Therefore, the mere fact that only six directors were seated after the majority vote did not conflict with Ideal's charter or federal regulations.

Second, federal law contemplates that as a result of a majority vote, all seats on the board of directors may not be filled. When Congress enacted the HOLA it expressly authorized the organization and regulation of federal mutual savings associations by the [FHLBB] 'giving primary consideration to the best practices of local mutual thrift and home financing institutions in the United States.' 12 U.S.C. § 1464(a). At the time of the initial enactment of HOLA, the general practice for state chartered mutual savings and loans was to require majority voting for directors. *See* Joseph H. Sundheim, *Law of Building and Loan Associations,* § 94 (3d ed. 1933). Moreover, the general practice contemplated that, under majority voting, negative votes might defeat a candidate for a seat on the board of directors even when that defeat left a vacancy on the board. This is because the state practice recognized that '[f]ailure to elect the full number of directors does not invalidate the election of those who receive the required number of votes.' *Id.* The [FHLBB] and subsequently the OTS carried this state practice forward into their regulation of federal mutuals."

■ Where a federally-chartered mutual savings and loan adopts a charter provision from a federal regulation and the language of that charter provision has an interpretation given it by the federal agency which both drafted the provision and regulates operations of the federal savings association, the federal interpretation of the federal charter form must be given deference and preempts any state public policy contrary to the federal agency's interpretation. *See de la Cuesta,* 458 U.S. at 153, 102 S.Ct. at 3022, 73 L.Ed.2d at 675 ("Even where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law."). Thus, even if Md.Code (1975, 1993 Repl.Vol.), Corporations and Associations Art., § 2–404(d) expresses a public policy in favor of plurality elections

in the absence of a clear charter or bylaw provision to the contrary, that public policy would be preempted. In the instant case, we hold that a plurality of votes cast would not be sufficient to elect a director.

## III.

The Murphy plaintiffs next contend that what they call "negative voting" is improper and negative votes should be considered as abstentions. The expansion of this argument is that when there are more vacancies than candidates, any candidate who receives any "for" votes has a majority of the votes cast since abstentions are disregarded. The Court of Special Appeals also agreed with this contention and stated that: "Because negative voting is contrary to the public policy of this state, the negative votes in this case can only be viewed as abstentions." *Madeline Murphy et al.*, Slip Op. No. 367 at 10.

The only authority cited by the Murphys for this proposition is *Coleman v. Marzullo*, 296 So.2d 437 (La.Ct.App.), *cert. denied*, 297 So.2d 206 (1974). In *Marzullo*, at the annual shareholders meeting of a corporation, the number of directors to be elected was fixed at 20, but only 15 candidates were nominated. This was consistent with the prior practice of leaving director positions unfilled and later filling those positions by a vote of a majority of directors elected at the annual meeting. This practice was summarized as follows:

> "The prior practice of our shareholders was to deliberately leave some authorized directorships vacant, by unanimous abstention from voting for anyone other than a proposed incomplete slate. (The purpose was to enable the directors to offer a directorship to an important prospective customer if occasion should arise.)"

*Marzullo*, 296 So.2d at 439.

At the annual meeting, after the number of directors was fixed at 20 and only 15 were nominated, 196,316 votes were cast for each of the 11 candidates and 26,331 votes were cast for each of the four other candidates. "Each shareholder who

voted for the four minority candidates also voted for the 11"
majority candidates. *Marzullo*, 296 So.2d at 440. The arti-
cles of incorporation provided for election by a majority of
votes cast. The lower court held that, although all 15 candi-
dates received some votes, only 11 received a majority of the
votes cast and only 11 were elected. *Marzullo*, 296 So.2d at
438.

The Court of Appeal of Louisiana reversed and explained:

"When there are more seats than candidates and no one's
candidacy is in opposition to another's candidacy, the only
meaning we can ascribe to the articles' provision is that, at
the *'Elections of Directors,'* in the election of *each* director,
the 'stockholder receiving the majority of votes cast at such
*election'* is any stockholder who receives one vote or more.
An absolute majority present orally expressed opposition to
the election of more than 11 directors, and the chairman of
the meeting took the position that abstention from voting
for more than 11 was a vote against electing any more than
11 of the 20 authorized directors. But the majority cannot
override the statutory and charter provisions for the elec-
tion of directors by the shareholders. The only result of
their action was to abstain from voting for nine of the 20
authorized directors (while some shareholders abstained
from voting for only five). Had the majority abstained from
voting altogether, the minority could not be deprived of
their right to vote for directors at the annual shareholders'
meeting. The partial abstention by the majority similarly
cannot deprive the minority of the statutory right to cast
one vote for each authorized director, R.S.6:3." (Footnote
omitted).

*Marzullo*, 296 So.2d at 440.

Thus, *Marzullo* may be distinguished from the instant case
because in *Marzullo* the chairman of the board took the
position that an abstention from voting for more than 11
candidates was a vote against the four other nominated candi-
dates. The chairman was obviously incorrect; an abstention
is not a vote against. In the instant case, we cannot say, as

the court said in *Marzullo,* that no one's candidacy was in opposition to another candidacy. At Ideal's election, there were apparently two slates which were at least in partial opposition to each other, and the decision was made to permit members to vote either "for" a candidate, "against" a candidate, or to abstain from voting. Abstentions were not counted as votes against, or even as votes cast. To the extent that *Marzullo* simply disapproved of counting abstentions as votes against, we agree with the holding.

As previously indicated, we must give deference to OTS's interpretation of its form charter provisions. OTS concludes that "negative voting" is permitted by Ideal's charter. In its *amicus curiae* brief it states:

> "Both Ideal's charter and 12 C.F.R. § 544.1 rest on a firm policy basis that requires a nominee to receive a majority of the votes cast before being elected a member of the board of directors. Mutual associations should be able to permit their members to reject persons, by voting negatively, whom they do not want running their association. Otherwise, where there are more positions available than nominees, members will be forced to accept **any** nominee (who as a depositor) ... votes for himself even where **all** the other members vote to reject such a nominee." (Emphasis in original) (footnote omitted).

The negative votes cast at the January 21, 1988 meeting were properly tabulated and only six directors were elected at that meeting. At oral argument before this Court, we were told that when this issue was resolved the parties would probably be able to work out the rest of their differences. We certainly hope so.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENTS.*