# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

BADLANDS TRUST COMPANY, a South
Dakota corporation, as Trustee for
Lola Brown Trust No. 1B,

*Plaintiff-Appellee,*

v.

No. 02-2088

FIRST FINANCIAL FUND,
INCORPORATED, a Maryland
corporation,

*Defendant-Appellant.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, District Judge.
(CA-02-2423-JFM)

Argued: December 6, 2002

Decided: January 30, 2003

Before WILKINS, MICHAEL, and KING, Circuit Judges.

---

Reversed by unpublished per curiam opinion.

---

## COUNSEL

**ARGUED:** Jeffrey B. Maletta, KIRKPATRICK & LOCKHART,
L.L.P., Washington, D.C., for Appellant. James Harold Hulme,
ARENT, FOX, KINTNER, PLOTKIN & KAHN, P.L.L.C., Washing-
ton, D.C., for Appellee. **ON BRIEF:** Donald B. Mitchell, Jr., J. Mar-

cus Meeks, ARENT, FOX, KINTNER, PLOTKIN & KAHN, P.L.L.C., Washington, D.C., for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

Badlands Trust Company (Badlands) sued First Financial Fund, Inc. (First Financial), seeking an injunction to require First Financial to seat two Badlands nominees as members of First Financial's board of directors. Badlands' nominees did not receive the number of votes required for election under First Financial's relevant bylaw. Badlands, however, argues that this bylaw violates Maryland corporation law and that the holdover of incumbent directors violates the federal Investment Company Act (ICA). The district court ordered First Financial to seat Badlands' nominees. Because we conclude that First Financial's bylaw is valid under Maryland law and that the practice of directors holding over does not violate the ICA, we reverse.

I.

Badlands is a large, but minority, shareholder in First Financial, holding almost forty percent of the shares. At an election for two directors at the annual meeting of shareholders in August 2002, the nominees supported by Badlands received almost sixty percent of the votes cast; the incumbents received roughly forty percent. The Badlands nominees, however, received only forty-seven percent of the outstanding shares eligible to vote. The incumbents received votes from roughly thirty-five percent of these outstanding shares. First Financial determined that under one of its bylaws, which requires that directors be elected by a majority of shares eligible to vote, no directors had been elected, resulting in a holdover of the two incumbents.

At the time of the annual meeting Badlands had a suit pending against First Financial in the United States District Court for the District of Maryland; Badlands was seeking information about First Financial shareholders. Badlands amended its complaint to claim that the bylaw for electing directors violated Maryland law and that the holdover violated federal law. Badlands also sought a preliminary injunction prohibiting the incumbent directors who stood for election in August 2000 from participating in board meetings. The district court granted Badlands' request for a preliminary injunction and enjoined First Financial from convening a meeting of its board until the court issued a final order. On September 19, 2002, the district court granted summary judgment for Badlands and enjoined First Financial to seat the Badlands nominees as directors. The district court stayed its final order temporarily, and we granted First Financial a stay pending appeal.

## II.

Badlands argues first that First Financial's bylaw, requiring directors to be elected by a majority of shares eligible to vote rather than a majority of votes cast, violates Maryland corporation law. Maryland General Corporation Law (MGCL) contains two provisions relevant to this suit. First, MGCL § 2-404(d) states: "Unless the charter or bylaws of a corporation provide otherwise, a plurality of all the votes cast at a meeting at which a quorum is present is sufficient to elect a director." Md. Code Ann., Corps & Ass'ns § 2-404(d) (1999). MGCL § 2-506(a) reads in relevant part: "Unless this article or the charter of a corporation provides otherwise, at a meeting of stockholders . . . [a] majority of all the votes cast at a meeting at which a quorum is present is sufficient to approve any matter which properly comes before the meeting." Md. Code Ann., Corps & Ass'ns § 2-506(a) (1999).

Badlands argues that § 2-506(a) essentially caps the number of votes necessary for approval of a matter at a stockholder meeting, requiring only a majority of votes cast (assuming the presence of a quorum). Increasing vote number requirements beyond the statutory cap, Badlands says, can be achieved in only two ways — by corporate charter or by statute. Both parties agree that First Financial has not established a different voting requirement in its charter; its more strin-

gent requirement is only included in a bylaw. Badlands recognizes that § 2-404(d) allows election of directors by a plurality rather than a majority of votes cast. Section 2-404(d) also permits changes to its plurality default rule to be made in a corporation's bylaws as well as its charter. Badlands urges us, however, to adopt the view of the district court and conclude that § 2-404(d) only authorizes alternative voting requirements that are *less* stringent than § 2-506(a)'s standard, thus invalidating First Financial's *more* stringent rule.

Badlands makes two primary arguments in support of its claim. First, it says that § 2-404(d) does not "provide[ ] otherwise" for vote requirements in director elections, as required by § 2-506(a) to alter that provision's default rule. To "provide otherwise," the argument goes, § 2-404(d) would need to spell out a specific mechanism through which a corporation could implement a heightened voting requirement. The only standard explicitly established by § 2-404(d) is the lower, plurality requirement. The language in § 2-404(d) that allows a corporation to make changes in voting requirements in its bylaws, Badlands says, merely permits changes that are consistent with § 2-506(a) and does not "provide" an alternate voting scheme requiring *more* votes than specified under § 2-506(a). Changes in the bylaws, Badlands concludes, can be used to alter the voting requirement to something above (or below) the plurality of votes cast, as established by § 2-404(d), but such changes cannot be used to increase the number of votes required to a level above § 2-506(a)'s majority-of-votes-cast rule. Second, Badlands argues that the legislative history of § 2-506(a) makes clear that the Maryland legislature was attempting to cap the number of shareholder votes required for corporations to act to reduce the chances of failed elections and that § 2-404(d) was designed to make election of directors even easier. To conclude that § 2-404(d) allows corporations to raise the number of required votes (and thus increase the likelihood of a failed election) through the relatively easy mechanism of a bylaw change, Badlands says, would undercut the clear intent behind § 2-506(a) and § 2-404(d). According to Badlands, the failed election in this case resulted from the application of precisely the sort of heightened voting requirement that both provisions were designed to prohibit.

We disagree with Badlands on both accounts. First, § 2-404(d) does in fact create an exception to § 2-506(a); it does, as § 2-506(a)

requires, "provide[ ] otherwise." "Provide" in this context means merely "to make a proviso or stipulation." *Webster's Third New International Dictionary* 1827 (1993). A "proviso," in turn, is simply a "condition, qualification, or limitation." *Id.* Section 2-404(d) is a condition, qualification, or limitation on § 2-506(a). It adopts a distinct default voting requirement in elections for directors and authorizes changes to its default rule to be included in corporate bylaws or corporate charters. It therefore falls within § 2-506(a)'s "provides otherwise" clause and permits changes in the number of votes required to elect directors. Nothing in the language of either provision suggests that changes are limited to those that require fewer votes than the default number set by statute.

To arrive at their interpretation of the statute, both Badlands and the district court rely on legislative history. No official committee report for § 2-404(d) is available, but an explanation included in the bill file says that the reduction in the number of votes required for election to a directorship is intended to "essentially eliminate the possibility" of failed elections and holdover directors. *See* Explanation of Senate Bill No. 659 Vote Required to Elect Directors (quoted in *Ideal Fed. Sav. Bank v. Murphy*, 663 A.2d 1272, 1277 (Md. 1995)). Badlands and the district court might well be reading the legislative history accurately, but this is not a case where there is a need to look past the statutory text. We do not consult legislative history where, as here, the plain and unambiguous language of the statute answers the question. *See, e.g.*, *United States v. Gonzales*, 520 U.S. 1, 6 (1997). Badlands urges us to look to the legislative history first to determine whether there is a conflict between the statutory text and the intent of the legislature. We recognize that there is language in cases decided by the Court of Appeals of Maryland that would appear to support this approach. *See Adamson v. Corr. Med. Servs.*, 753 A.2d 501, 508 (Md. 2000) ("[T]he plain-meaning rule is elastic, rather than cast in stone. If persuasive evidence exists outside the plain text of the statute, we do not turn a blind eye to it.") (internal citations omitted); *Williams v. Mayor & City Council of Baltimore*, 753 A.2d 41, 49 (Md. 2000) (noting that even where the court did not "describe any of the statutes involved . . . as ambiguous or uncertain, [it] did search for legislative purpose or meaning") (internal quotations omitted); *Tucker v. Fireman's Fund Ins. Co.*, 517 A.2d 730, 731 (Md. 1986). Nevertheless, these same cases begin with the traditional rule that where there

is no ambiguity in the plain language of the statute, a court does not look to the legislative history. *Adamson*, 753 A.2d at 508 ("If the legislature's intentions are evident from the text of the statute, our inquiry normally will cease and the plain meaning of the statute will govern."); *Williams*, 753 A.2d at 49 ("Where the statutory language is plain and free from ambiguity, and expresses a definite and simple meaning, courts normally do not look beyond the words of the statute to determine legislative intent."); *Tucker*, 517 A.2d at 732 ("[W]here statutory provisions are clear and unambiguous, no construction or clarification is needed or permitted, it being the rule that a plainly worded statute must be construed without forced or subtle interpretations designed to extend or limit the scope of its operation."). We read these cases to mean that in Maryland, as elsewhere, when the text of the statute itself is not ambiguous, we do not look to the legislative history to create ambiguities.

We are left, then, with the clear commands of the statutes. Section 2-506(a) allows alterations in the voting requirement (from a majority of the votes cast) only if provided in the corporate charter or in article 2 of the MGCL. Although First Financial does not have such a provision in its charter, a provision in article 2 of the statute provides otherwise. Section 2-404(d) adopts an even lower voting requirement for the election of directors, but permits a different requirement to be established by charter or bylaw. First Financial's bylaws plainly establish a higher voting requirement for the election of new directors; they must be elected by a majority of the shares eligible to vote. Because First Financial's bylaw "provides otherwise," its bylaw is lawful and controls the outcome of this election.

Badlands' final argument also fails. Badlands notes that MGCL § 2-104(b)(4) explicitly allows corporations to include in their charters provisions raising the voting requirement above that provided by statute; § 2-110, which governs bylaws, contains no such provision. *See* Md. Code Ann., Corps & Ass'ns § 2-104(b)(4) & 2-110 (1999). Thus, Badlands argues, heightened voting requirements can only be included in corporate charters, not bylaws. This argument ignores the language of § 2-110, which does not provide a closed list of permissible subjects for bylaws, but instead specifically states that bylaws "may contain any provisions not inconsistent with law or the charter of the corporation." Md. Code Ann., Corps & Ass'ns § 2-110 (1999).

Because a heightened voting requirement is not inconsistent with law or First Financial's charter, it can be included in the bylaws.

We conclude, therefore, that First Financial's bylaw requiring directors to be elected by a majority of eligible votes is valid under Maryland law. Because Badlands' nominees did not receive the required number of votes, its nominees cannot be seated as members of First Financial's Board of Directors.

III.

Because the district court found for Badlands on the state law question, it did not reach the issue of whether the holdover of directors violates the Investment Company Act of 1940 (ICA). Because we have concluded that the Badlands nominees were not validly elected under Maryland law, we must consider the federal law issue.

The Investment Company Act of 1940 (ICA) mandates, among other things, that "[n]o person shall serve as a director of a registered investment company unless elected to that office." 15 U.S.C. § 80a-16(a). It also permits corporations to divide directors into classes, but it requires that the term of at least one class expire every year. *Id.* Badlands asserts that it has an implied private right of action to enforce violations of this statute and that First Financial's holdover of directors violates the statute in two ways. First, it suggests that because the incumbent directors are holding over, they were not "elected to that office" as required by § 80a-16(a). Second, it argues that even if the directors were elected, some portion of the board — one class — must step down from the board every year.

Whether Badlands has an implied right of action under § 80a-16(a) is an interesting and debatable question. *Compare Lessler v. Little*, 857 F.2d 866, 871-73 (1st Cir. 1988) (allowing a private right of action under § 80a-17(a)(2) of the ICA), *with Olmstead v. Pruco Life Ins. Co.*, 283 F.3d 429, 436 (2d Cir. 2002) (concluding that §§ 80a-26(f) and 80a-27(i) of the ICA did not create private rights of action).

Even if § 80a-16 does provide a private right of action, Badlands would still be unable to prevail because the holdover of the incumbent

directors does not violate the ICA. We agree with First Financial that the incumbents were elected within the meaning of the ICA. Section 80a-16 states that "[n]o person shall serve as a director of a registered investment company unless elected to that office by holders of the outstanding voting securities of such company, at an annual or a special meeting duly called for that purpose." 15 U.S.C. § 80a-16(a). The incumbents were in fact elected by shareholders at such a meeting, although not the most recent meeting. The ICA was passed to ensure that investment companies were not managed by insiders for personal profit. *See* Sheldon A. Jones et al., *The Massachusetts Business Trust and Registered Investment Companies*, 13 Del. J. Corp. L. 421, 450 (1988). Section 80a-16(a)'s requirement that directors be elected by shareholders provides further assurances that "those having funds at risk in the equity securities of an investment fund elect its directors." *Prudential Ins. Co. of Am.*, 41 S.E.C. 335, 351 (Jan. 22, 1963). The election of the two incumbents here at a prior shareholder meeting satisfies the plain language of § 80a-16(a). Shareholders, not corporate insiders, are responsible for their presence on the board even though they are now holding over.

Moreover, state laws that do not directly conflict with the ICA or its policies are not displaced by the ICA, *see Burks v. Lasker*, 441 U.S. 471, 479-80 (1979), and the use of holdover directors does not create such a conflict. The ICA requires that when directors are divided into classes, the term of at least one class of directors must expire each year. 15 U.S.C. § 80a-16(a). No one disputes that the terms of two incumbents have expired, but the ICA is silent about what to do in a failed election. In this case, the incumbents have remained in place, serving as holdover directors pending a valid election of replacements. *See* Md. Code Ann., Corps. & Ass'ns § 2-405 (1999). Because the ICA is silent on this point, the use of holdovers, authorized by Maryland law, does not directly conflict with federal law. Nor does their use violate policies of the ICA. The Securities and Exchange Commission has explained that § 80a-16(a) is designed to ensure that substantial changes in the composition of a board of directors are not made without the knowledge or approval of shareholders. *See John Nuveen & Co.*, 1986 SEC No-Act. LEXIS 2943 (Nov. 18, 1986); *State Bank & Mortgage Co.*, 1972 SEC No-Act. LEXIS 3322 (Aug. 7, 1972). The holdover situation here was the result of a failed election at a regular shareholder meeting; it did not stem from a back

room deal kept secret from investors. Moreover, the measure is only temporary. The holdover directors can be replaced when successors are validly elected. Furthermore, provisions allowing holdovers are common in state law as well as model corporation codes. *See, e.g.*, Md. Code Ann., Corps & Ass'ns § 2-405 (1999); *see also* 2 Victoria A. Braucher et al., *Fletcher Cyclopedia of the Law of Private Corporations* § 344 (2d ed. 1998). This widely used, stopgap measure provides for the smooth functioning of corporate governance and gives time for shareholders to hold new elections. If holdovers are not permitted, the only recourse in failed elections would be dissolution of the corporation. Nothing in the ICA suggests that this would be a preferable remedy. *See also Levine v. Beem*, 608 So. 2d 373, 375 (Ala. 1992) (concluding that holdovers are preferable to dissolution). Because the incumbents were elected by shareholders and because the use of holdovers is not in conflict with the ICA or its policies, we see no violation of the ICA.

The decision of the district court is therefore

*REVERSED.*